**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SCHILL STEEL PRODUCTS, INC., Respondent.**

**No. 21110.**

United States Court of Appeals, Fifth Circuit.

April 19, 1973.

Contempt Adjudication June 29, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Dominick L. Manoli, Associate Gen. Counsel, NLRB, Russell H. Gardner, Lawrence Gold, Washington, D. C., Attys., for petitioner.

V. Scott Kneese, Houston, Tex., for respondent.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This fight has had a long and tortuous history before the Fifth Circuit Court of Appeals. Hopefully, the bell has sounded for the last round, at least with this court as referee. The instant controversy arises on the petition of the National Labor Relations Board requesting that this court hold Schill Steel in contempt for failure to fully comply with this court's mandate in National Labor Relations Board v. Schill Steel Products, Inc., 340 F.2d 568 (5 Cir. 1965).

On January 19, 1968, the National Labor Relations Board filed a "Petition for Adjudication in Civil Contempt and for Other Civil Relief" with this court, alleging that Schill Steel had resisted, violated and disobeyed our previous order. On February 19, 1969, this court appointed a special master to hear the contempt proceedings. National Labor Relations Board v. Schill Steel Products, Inc., 408 F.2d 803 (5 Cir. 1969). The special master set forth findings of fact and conclusions of law in an initial report issued on March 21, 1972. In that report the special master failed to address certain issues raised in the N. L. R. B. petition due to his belief that this circuit did not wish him to rehear evidence on matters which had already been the subject of N. L. R. B. unfair labor practice proceedings. In a short order issued May 16, 1972, this court remanded the case to the special master with instructions to issue supplemental findings and recommendations on the matters which he had failed to address in his initial report. This supplemental report was issued on May 24, 1972, and both Schill Steel and the Board filed objections. It is now incumbent on this court to examine the master's opinion, the objections thereto, and to render, at last, a decision on whether or not this respondent has indeed placed itself in comtempt of this court's 1965 mandate.

I

In the original enforcement proceeding brought by the N. L. R. B., this

court reviewed and enforced two separate orders of the Board. In these orders the N. L. R. B. had found that Schill had violated section 8(a)(1) of the National Labor Relations Act by improper interrogation of employees and by making threats and promising benefits during a union organizational drive; violated sections 8(a)(3) and (1) by discriminatorily discharging two men; and violated sections 8(a)(5) and (1) by refusing to bargain with the certified representatives of its employees.

Following an organizational drive at the respondent's Houston, Texas, warehouse, the N. L. R. B. ordered a representation election. The employer objected to the unit determination of the Board, alleging that a company-wide union would be more appropriate, but the Board rejected this claim. Following a union victory in the election, the employer consistently refused to bargain with the union as representative of its employees. Respondent has subsequently argued that his refusal to bargain was only a device to gain review of the unit determination made by the Board.

This court enforced the Board's order in all particulars. Our decision took note of the obvious hostile attitude of the employer, stating "specific and literal threats of reprisal came from the respondent's top executives." We further noted that "the record brims with evidence of the Company's anti-union animus." In short, it is patently obvious from the record that this employer, prior to 1965, had been extremely hostile to unionization.

## II

The N. L. R. B., in its contempt petition, assigned several instances in which it alleged that the company had acted in contempt of this court's earlier order. As previously noted, the master sustained some of these allegations and rejected others. Both sides have filed objections on those issues in which the master reported against their position. We consider the findings and objections on each major issue blow.

### Refusal to Execute the Contract

The most serious and far-reaching charge brought by the Board against the company is that the company failed to bargain in good faith with the union in that once an agreement had been reached between the parties the company unlawfully refused to sign the document embodying this agreement.[1] This court's initial opinion in this case was handed down on January 11, 1965. The overture to bargain was made by the company in a letter dated January 13, 1965, but bargaining did not commence until late February. There were various meetings between union and company representatives throughout the year 1965. The company representative, by letter of December 15, 1965, sent the union representative what the company styled as its "final proposal" and asked approval of either of two contracts enclosed. The union representative was out of town and did not return until January 3, 1966.

The master found that on January 4, 1966, the union decided to accept a contract which incorporated provision for an arbitrator selected by the district court. The master found that the union representative tried to contact the company representative several times by telephone between January 5 and January 11, 1966, before he finally was able to contact him on the latter date. There was, following this, some more give-

1. In the Board's order which we granted enforcement, one section specifically directed:

(b) Upon request, bargain collectively with United Steelworkers of America, AFL–CIO, as the exclusive representative of all employees in the appropriate unit with respect to rates of pay, wages, hours of employment, and other conditions of employment, and, if an understanding is reached, embody such understanding in a signed agreement.

It is also an unfair labor practice to refuse to sign a written instrument which embodies an agreement reached by the parties. H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 523–526, 61 S.Ct. 320, 85 L.Ed. 309 (1941).

and-take between the union and company representative over the next few days ironing out the last remaining points of contention between the parties. The master found that the parties agreed to consummate the contract on the morning of January 13, 1966. At that meeting it was discovered that the union representative had erroneously brought to the meeting the wrong contract of the two submitted. The company representative, however, furnished a copy of the proper contract and, after the few changes agreed upon were made in the contract, the union representative signed the contract for the union. The signed contract was left with the company representative who stated that he would give it to the company. On January 14th, the company representative and the company president and personnel manager met and discussed the contract. On January 17th, the company notified the union that it refused to execute the contract, claiming that it felt the union did not represent a majority of its employees at that time. The company also filed a petition with the N. L. R. B. requesting an election in the plant.[2]

By letter of January 17, 1966, the company asserted that its sole reason for refusing to sign the agreement was its doubt that the union still had majority support. The special master rejected the reasons given by the company for its feeling that the union had lost majority support from the employees. First, the company claimed that during negotiations it sensed the weakening of strength on the part of the union because it felt the union did not bargain as hard on certain issues as it would have if it had support. The court rejects this totally subjective "feeling" as totally insufficient to even serve as evidence of weakness. The company points to a couple of other minor instances in which it felt the union actions showed lack of support. These are also without merit.

One of the major claims of the employer is that because of employee turnover since the original election in August of 1962, it had reasonable grounds to believe the union did not still represent a majority. First, it points out that only 17 employees among the 55 employed in January, 1966, had been in the unit at the time of the 1962 election. Strong reliance on this position, however, overlooks the fact that the employer had committed serious unfair labor practices both prior to 1962, and continuing, allegedly, well past 1966. There is no doubt that from the time of the election in 1962, the employer committed a serious unfair labor practice in refusing to bargain with the duly elected representative of his employees. It is well recognized that delay by an employer is one of the major weapons which he can use to sap the strength of the union. The employees often begin to see unionization as futile and the employer is given the added incentive of turnover and the presence of new employees. Giving great weight to employee turnover under these circumstances allows the employer to profit from his "own wrongful refusal to bargain." Franks Brothers v. N. L. R. B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1938).[3]

2. This petition was subsequently dismissed by the Board, without appeal by the company, and no election was ever held. The Board held that a "reasonable period" for bargaining had not elapsed.

3. We note that in cases where the Board has ordered an employer to bargain solely on the basis of signed union representation cards and in light of very serious unfair labor practices, the circuit courts have been inclined to reject claims by the employer that the cards are no longer valid due to employee turnover between the time of the original demand of the union and the actual Board order directing the company to bargain with the union. This rule is, of course, derived from the Franks Brothers case. See J. P. Stephens & Co. v. N.L.R.B., 5 Cir., 1971, 441 F.2d 514; G.P.D., Inc. v. N.L.R.B., 6 Cir., 1970, 430 F.2d 963; N.L.R.B. v. Lou De Youngs' Market Basket, 6 Cir., 1970, 430 F.2d 912; N.L.R.B. v. Henry Colder Co., 7 Cir., 1971, 447 F.2d 629. The Supreme Court has re-

It is crystal clear that at no time prior to the January 17th letter had the company expressed to the union any doubt of the continued majority status. The company maintains that it had duly bargained with the union for over a year and that a year is generally considered a reasonable period. The company relies on the original Fifth Circuit opinion date of January 11, 1965, as a starting point for determining the period for which they must bargain. The company takes the position that the very latest date which can be seen as the beginning of a reasonable period is January 13, 1965, the date on which the company mailed its letter to the union offering to recognize the union and bargain with them. At the outset, we note that here it would be possible to play the one-year game and say that the union did not receive the letter until January 14, 1965, and that that is the initial date and since the master found that agreement on contract was reached by the representatives on January 13, 1966, that this period was clearly within one year which the company urges should apply. We reject such a highly technical approach. The requirement seems to be a "reasonable period" and it is not per se unreasonable to say that as long as the parties are bargaining in good faith it may take more than one year to reach a contract. The one-year provision is a general rule of thumb taken from the usual one-year certification period. Certainly one day one way or the other is not to govern. Therefore, we reject the contention that the company bargained in good faith for a reasonable period in this case.

Even if we did not find that a reasonable period had not elapsed, we are confident that the company here had no genuine basis for its claim of noncontinued union majority status. This company had been guilty of a long series of unfair labor practices and open hostility to the union. The primary justification it now gives for its belief in noncontinuation of majority status is based on subjective inferences that various officers of the company allegedly drew from certain actions of the union in bargaining. Thus it appears to this court that the company simply seized upon a convenient argument in an attempt to avoid its statutory duty.

We note that here, as is often the case in labor cases, the employer argues valiantly for the right of the "rank and file" to be protected against the imposition of a union they did not want. Counsel for the company eloquently argues that purposes of the Act are frustrated when a union is imposed on employees against their will. What this pious statement overlooks is that there once was indeed a fair representation election in this bargaining unit and that the union was selected by a majority of the employees. It further overlooks the numerous unfair labor practices which the employer engaged in to bring illegal pressure on employees to reject the union. It overlooks the unlawful refusal of the employer to bargain with the employees chosen by the very method of selection that it now claims would have been frustrated had it not risen up on January 17, 1966, to challenge the union's representative status. While such representations are not at all novel arguments by employers before this court, the overnight transformation to real concern for the "free choice" of the employees by the employers who make these arguments in such cases never ceases to amaze us. Had this concern which manifested itself in January of 1966 been present after the election of August, 1962, we have no doubt that the tremendous expense involved in this lengthy proceeding could have been avoided. Finally, as noted, we do not feel the company was justified in its new-found doubt or that there will be "imposition of an unwanted union."

cently reaffirmed this principle in bargaining order cases. See N.L.R.B. v. Gissel Packing Company, 395 U.S. 575, 610– 613, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Cf., N.L.R.B. v. American Cable Systems, Inc., 5 Cir. 1970, 427 F.2d 446.

It seems clear to us that the company and the union had indeed reached full accord on all contract terms as of January 13, 1966. The only reason put forth by the company for its failure to sign this contract was its alleged belief that the union majority had dissipated. There are some suggestions that the representatives were not authorized to agree to the changes made but the overwhelming evidence in the record establishes that the company really had no quarrels with the minor changes which the union had made in the final contract and to which its representative had agreed.[4] In fact, President Schill stated in his letter to the union on February 7, 1966, that the company was ". . . not categorically refusing to sign a contract with the union upon the identical terms and conditions as proposed in its final offer."

■ In the letter dated January 17, 1966, the company took the position that the final offer letter from the company with the enclosed alternative contracts was an offer which terminated at the end of December. This was never conveyed to the union spokesman in any other manner and was never mentioned prior to the refusal on January 17th to sign the agreed to contract. All of the evidence and actions taken by the company after the end of December, 1965, show clearly that as far as outward appearances were concerned, the company was still treating its final offers as open. These later assertions by the company seem to fit well with its new

found rationale that the one year was up and now it no longer had to deal with this union. Thus, the company, at the time in question, was not really claiming that any minor changes proposed and accepted by its representative at the last minute were the reasons that the company refused to sign the contract. In fact, President Schill's letter of February 17th stated that the company had already placed into effect all the economic benefits envisioned in that contract. In short, the entire record demonstrates that the primary desire of this company was to avoid at all costs a continuing working relationship with the union once chosen by its employees. It fought long and hard to avoid the consequences of a fair election. Finally, at the moment of fruition of the union's desires, the company once again tried to snatch victory from the jaws of defeat. In so doing it demonstrated a consistent bad faith that flies in the face of national labor policy as embodied in the National Labor Relations Act and, more importantly, violates directly the letter and the spirit of this court's order enforcing the earlier N. L. R. B. decisions.

Therefore, we find that the master was correct in holding that the company and the union had agreed to a contract on January 13, 1966, and that the failure of the company to sign the agreement was a violation of the Act. The statements made by the company and its representatives in January and February, 1966, clearly refute the various claims that Schill tried to make in this

4. Examination of the record before the trial examiner shows that the only possible claim by the company that at the meeting on January 13th there was a change in the contract which it had not agreed to was that one of the clauses dealing with daily overtime was scratched off. In rejecting this clause the union agent stated that it was only part of what they asked for and they would rather have all of their request with regard to the overtime or no clause whatsoever. In effect, he was giving up a point rather than agree to a benefit simply because the benefit was something they had in no other contracts and they did not want to agree

to something less than what they had in other contracts for fear it would hurt them in later contract negotiations with other parties. Therefore, if anything, this was definitely a direct benefit to the company, not to the union. In any event, we think the evidence is ample that the company engaged in mere pretexts of every imaginable sort in a futile attempt to avoid the legal obligation to sign this contract. This seems borne out by the letter from President Schill referred to above which stated that the company had no quarrel with any of the proposed contract items.

contempt proceeding. The inconsistencies are legion and in this case fatal.

*Discrimination Against Robert Jones and Lionel Jackson*

In May of 1966, Robert Jones and Lionel Jackson were discharged by the company. Subsequently these two individuals were reinstated on orders of the N. L. R. B.,[5] which had found that the discharge violated sections 8(a)(3) and (1) of the Act. The Board trial examiner found that the firings were due to Jackson and Jones' participation in union organizing activities and that their discharge was part of the employer's continuing anti-union campaign. Immediately following reinstatement, there began a series of disciplinary suspensions directed toward Jackson and Jones which eventually resulted in Jackson's dismissal. The Board assigned both the initial discharge and the subsequent suspensions and discharge as incidents of contempt in its petition.

The special master found that there was insufficient evidence to hold the company in contempt for the initial firings of Jones and Jackson. The Board does not directly challenge these findings before the court. The special master went on to find, however, that the second firing of Jackson and the suspension of Jones were motivated by an anti-union animus and were thus actions in contempt of this court's decree.

■ We do not find it necessary to set forth in detail all the facts surrounding the suspensions. We will agree with the special master that the original firings were indeed fairly close and since this is a contempt proceeding will not find them to be in violation of this court's order. However, we also agree with the master that after the earlier Board proceedings reinstating these individuals the company did undertake pretextual suspensions which were at least in part retributions for the earlier Board action of reinstatement and were directly related to the identification of these individuals with the union. We base this finding on the fact that the disciplinary actions began almost immediately upon reinstatement and that the union was able to prove to our satisfaction that other employees who had committed similar minor infractions, where there were such alleged minor infractions, had not been punished nearly so severely as Jackson and Jones.

*Coercive Statements of Leaderman Jackson*

The record and findings of fact by the special master are clear that leaderman Joseph Brooks on several occasions made statements to Robert Jones and Lionel Jackson which indicated that superintendent Griffin was discriminating against them because of their union activities. The special master held that since Brooks was the brother-in-law of Robert Jones these statements could not be attributed to the company because of the family connection and their long friendship. Furthermore, it was shown that Brooks had been sympathetic to the union campaign. Therefore, the master considered this conversation one between "coconspirators" and, thus, there was no element of a threat or unlawful coercion.

■ The sole question here is whether or not these statements should be charged to the company as a threat made by a supervisory employee. After careful reflection, we have determined that the statements should not be charged to the company in this situation. Of course, it is always possible that the company relied on the relationship between Brooks and Jones to make sure that the message filtered down directly to Jones. It is equally true that the clear message to an employee that he is being discriminated against because of union membership may be just as devastating when it comes from a friend as from merely a supervisor; in fact, it may often be more telling because it will undoubtedly be delivered with sincerity

5. Board Case No. 23–CA–2404, reported at 166 NLRB 350.

of conviction. Our problem is that in this case we are dealing with a contempt citation. Were this a Board enforcement proceeding we might be inclined to approve attribution of these statements to the company if the Board had so found. We are reluctant to do so, however, in this case since civil contempt with its severe and extraordinary penalties is involved.

### Discharge of Supervisor Paul Jones

Supervisor Paul Jones, brother of Robert Jones, was allegedly discriminated against and ultimately discharged by the company because of his connection with the union. In October, 1966, Jones, a newly promoted leaderman, was subpoenaed to appear before the Board in an unfair labor practice proceeding then pending against Schill. Shortly before the hearing Jones was called in to talk with management and the company attorney about this matter. Jones was asked by the company attorney about any statements made to Board investigators and requested to supply a copy. Jones was told to go home and get a copy of his statement. There was a dispute as to whether Jones was told to get it on his own time, and the special master held that it was unreasonable to believe that the company was ordering Jones to go get the statement on his own time. Jones failed to produce the statement.

At the subsequent hearing Jones testified against the company. Jones claims that immediately following the Board hearing his superiors began a number of discriminatory reprimands and the denial of a promised wage increase. In July, 1967, the Board upheld the trial examiner's finding of a violation in the unfair labor practice case in which Jones had testified against the company. Jones was fired two weeks later after he protested to Griffin for Griffin's cursing him. At that time Griffin summarily discharged him saying that his work had been unsatisfactory and that he talked back constantly. The special master failed to find a discriminatory discharge of this supervisor because of the time periods involved between the original testimony and the ultimate firing.

The company argues in its brief that a truly anti-union employer would have fired Jones on the spot and not waited so long to take action. We disagree. As the Board points out, there is ample evidence of a change in the company's attitude toward Jones following his testimony before the Board. We feel that discrimination against or discharge of employees, whether mere employees or supervisors, who have given adverse testimony before the N. L. R. B. is one of the most serious unfair labor practices. See N. L. R. B. v. Better Monkey Grip Co., 5 Cir., 1957, 243 F.2d 836. We think that there is ample evidence that in this case there was sufficient discrimination, coupled with superintendent Griffin's admitted hostility toward unions, to justify this court in concluding that the discharge of Jones was due in great measure to his testimony against the company before the Labor Board.

Motivation in discharge cases is a very difficult issue to establish one way or the other. Employers, as here, can always argue that this was a supervisor whose work had been "unsatisfactory" and that he talked back too much to his superiors. Supervisors, not usually protected by a grievance procedure, are especially vulnerable to these sorts of claims. In light of this employer's history of extreme of anti-union activities, we do not accept the argument that the time span is too great for the firing to be attributed to the earlier testimony. As shown by the analysis of the contract negotiations, this employer has shown great patience in dealing with the union before allowing his true colors to once again surface. We, therefore, find that the discharge of supervisor Paul Jones was based on a desire to punish him for his testimony before the Board and was, thus, a violation of the Act and this court's decree.

*Refusal to Grant Wage Increases*

**III**

During the period of negotiations between the union and the company the parties reached agreement on a plan to allow individual merit wage increases in the sound discretion of the company, subject only to notice to the union. Furthermore, the union agreed to allow the company to institute this practice immediately even though there was still further negotiations envisioned before a full contract was to be signed. The facts are clear that numerous employees approached superintendent Griffin with requests for wage increases after the union had notified the company that it could unilaterally begin this practice. It is also clear that Griffin's repeated answers to those union members seeking individual merit increases were that "his hands were tied" and that the union was preventing him from giving any such increases. Griffin's position is that he was under a false impression about individual wage increases and the position of the union thereto and simply made a mistake. He also testified, however, that despite his mistaken impression, he never made the statements. There was never any attempt to correct this mistake in the minds of the employees once it was discovered. The special master pointed out that Griffin was "not too enthusiastic" about the union's presence, but the master took the position that these statements were not "threats" within the meaning of section 8 of the Act. Before this court, the Board takes the position that these statements need not be found to be "threats" and that it is sufficient so long as they are reasonably calculated to coerce the employees. It is clear that they would leave a false impression in the eyes of employees since it was not true that the union was blocking such wage increases. We think that this is sufficient evidence in light of respondent's general anti-union posture to warrant the conclusion that there were violations of the Act. We find that they were designed to further weaken union support in this unit.

*Choice of Remedy.* The company objects here that certain of the issues involved in this contempt petition have already been subject of N. L. R. B. unfair labor practice proceedings. The company takes the position that the Board has, therefore, seen fit to elect a remedy before the Board and its only recourse is to seek enforcement of those orders and that the Board is barred from raising those issues in a contempt petition. We find this argument wholly without merit. First, we note that the special master accepted this argument in his first opinion and declined to entertain relitigation of these matters once litigated before the Board. This court, however, reversed that determination of the master and remanded the case for further findings on these issues. We are satisfied that that is the law of the case on this issue.

However, we wish to state that we fully agree with the Board's position that relitigation is desirable and reject the company's claim that such relitigation was "extravagant surplusage." The power to hold respondent in contempt is peculiarly one which derives from our power to see that our orders are complied with. The fact that some of the issues involved in a contempt petition may have been previously litigated before the Board in unfair labor practice petitions does not make it incumbent on this court to take only the evidence presented in those proceedings and rely on the rulings made by the Board and its trial examiners. Rather, contempt of this court's order is a violation directly against this court. In such cases we feel it is generally preferable, wherever we so desire, to appoint a special master to take testimony under our instructions and to report that directly to the court. We feel in many cases this will probable result in a greater measure of benefit to the one charged with the contempt because at the time of the factual hearings he will be fully apprised of

the charges made against him as they relate to our earlier opinion. Furthermore, he will know at the time the full seriousness of the charge and the possible consequences thereof.

### Delay in Seeking Contempt Citation

Respondent Schill Steel also objects that the Labor Board should be barred in this case because it waited until 1968 to institute proceedings before this court to have respondent adjudged in contempt. We find this patently without merit. We do not encourage the N. L. R. B. to come to this court with contempt petitions as soon as they feel a violation of the order has occurred. This is especially true in the difficult area of labor relations where the Board may not be able to determine whether or not a significant violation has occurred until it has already done lengthy investigation, possibly including a full Board proceeding. The charges in this case were filed roughly two years after the company's refusal to sign the contract with the union. During that time the Board was hearing numerous unfair labor practice charges against this respondent and actually found respondent guilty of unfair labor practices in at least two instances. Another reason for not forcing the Board to rush in or holding it barred by laches is that the Board should be given an opportunity to see how widespread and flagrant the violations of the court's order are. The Board may not wish to pursue the extraordinary remedy of contempt where the violations are relatively minor or isolated and turn on close questions of factual interpretation. We certainly do not encourage the Board to file contempt cases following every enforcement order where some activity which the union charges is an unfair labor practice occurs. Therefore, we find no undue delay by the Board in seeking a contempt order from this court.

### IV

We are fully convinced that respondent Schill Steel has repeatedly attempted to evade its statutory obligation to allow its employees to be represented by a union of their choice. Furthermore, we find that this posture was also a deliberate attempt to avoid the implications of this court's order in prior enforcement proceedings. A citation for contempt of this court is indeed a very serious matter. We do not hold employers in contempt very often, nor does the Labor Board seek a great number of contempt citations. Here, however, we have what we consider a flagrant attempt to avoid the consequences of an order of this court, especially with regard to the manner in which Schill Steel tried to evade the signing of an agreed to contract. The excuses given therefor are clear evidence of the bad faith which this respondent has exhibited in dealings with the union. We also feel that many of the arguments made by counsel for Schill Steel in this case are contradictory and obviously not based on the facts and the record. We, therefore, find that respondent Schill Steel has so violated an order of this court that we now find it in civil contempt. In light of the fact that we have, in this opinion, for the first time set out the specific grounds upon which we feel respondent has placed itself in contempt, we direct the National Labor Relations Board to file a suggested purgation order with this court within seven days from the date of this opinion. Respondent is given an additional seven days to file objections and recommendations.

For the reasons stated above, respondent Schill Steel is adjudged guilty of civil contempt of this court and the petition for civil contempt presented by the National Labor Relations Board, in the particulars set forth above, is

Granted.

### CONTEMPT ADJUDICATION

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

PER CURIAM:

On April 19, 1973, this court filed an opinion finding that Schill Steel Prod-

ucts, Inc. violated the decree of February 2, 1965, and is in civil contempt therefor. We now seek to set forth the steps necessary for the company to purge itself of this contempt. It is indeed difficult to formulate an order in these cases where a party is simply being told to do what it has already been told to do once by this court. However, because of the serious nature of contempt of this court, we feel certain that the company will directly comply with our orders. It should be unnecessary to add that *any* further violation or infringements of the rights of the employees involved by this company will be met with an extremely harsh sanction from this court.

 At the outset, we would like to address a point which the company has found disturbing in our opinion. With regard to one year not being a "reasonable period" in all cases, the company seems to take the position that we have developed some new rule and applied it to their detriment since they relied on one year. The thrust of our statement was simply to state that we will not be bound by some highly technical and somewhat arbitrary one year period in a contempt case where the record clearly indicates to us that the reliance on the one year period was in bad faith and merely an attempt to seize on a technicality as a way to avoid the statutory and court ordered duty involved. Generally the one year rule is applicable, but we will not sanction its use where such use is designed to further frustrate employee desires despite court order. Such application of this artificial rule of convenience would run counter to the purposes of the NLRA.

Finally, we are thoroughly willing to say that one year had not elapsed and also to hold that there was no good faith doubt of majority status. We note that in Board cases, the Board considers the initial period of certification as beginning on the date the company commences to bargain in good faith with the union. See Mar-Jac Poultry Company, Inc., 136

NLRB 785; Commerce Company d/b/a Lamar Hotel, 140 NLRB 226, 229, enfd. 328 F.2d 600 (C.A.5), cert. denied 379 U.S. 817, 85 S.Ct. 32, 13 L.Ed.2d 28; Burnett Construction Company, 149 NLRB 1419, 1421, enfd. 350 F.2d 57 (C.A.10). Here, as we have shown in the opinion, such bargaining did not begin with the date of this court's enforcement order.

 We now turn to the purgation order.

The court having on April 19, 1973, filed its opinion finding that Schill Steel Products, Inc. violated the decree of February 2, 1965, it is

Ordered and adjudged that Schill Steel Products, Inc. is in civil contempt of the said decree of February 2, 1965, and it is

Further ordered that the Company by its officers, directors and agents shall purge itself of such contempt by:

1. Complying in full with the Board's orders of February 8, 1963 (140 NLRB 1164) and August 20, 1963 (144 NLRB 69) as enforced by the said decree and not in any way, by action or inaction, commit, engage, induce, encourage, permit or condone any violation of the said decree.

2. Forthwith offering to Lionel Jackson and Paul Jones their former positions, or if any of such positions is no longer available, a substantially equivalent position, without prejudice to their seniority or other rights or privileges; and making each of them and Robert Jones whole for any loss of pay, with six percent interest thereon, due to the discriminatory discharges of Lionel Jackson and Paul Jones and the discriminatory suspensions of Lionel Jackson and Robert Jones. The amount of such backpay, unless agreed to by the parties, shall be computed by the Board in a backpay proceeding subject to further review by the court.

3. Preserving and upon request making available to the Board or its agents at such reasonable place or places as the

Board's Regional Director may specify for examination, copying and reproducing all the payroll, personnel and other records necessary or useful to determine the backpay due and to verify compliance with any provisions of this order.

4. Notifying the United Steelworkers of America, AFL–CIO (herein called the Union) in writing, within 15 days from the entry of this order that it recognizes the Union as the exclusive representative of its employees in the designated unit and that, upon request of the Union, it will execute the agreement concluded with the Union in January 1966, said agreement to have a termination date one year from the date upon which it is executed by the Company.

5. If so requested by the Union, executing said agreement with the terminal date one year from the date of execution and delivering the executed copy to the Union within five days of the receipt of the Union's request therefor, and thereafter honoring said agreement and each of its provisions in good faith.

6. If the Union does not request the Company to execute the said contract, upon request of the Union bargaining collectively in good faith with the Union as the exclusive representative of the Company's employees in the designated unit until full agreement or *bona fide* impasse is reached, and if any understanding is reached, incorporating such understanding in a written agreement. The existence of a *bona fide* impasse must be decided by this court and the failure to find such an impasse will be considered failure to bargain in good faith, resulting in the sanction of paragraph 8 below. In no event shall the Company refuse to meet with the Union at reasonable times or withdraw recognition from the Union as such collective bargaining representative until further order of this court. Without written permission from the Union, bargaining sessions will be held for at least 15 hours per week.

7. Any individual or agent authorized by the Company to negotiate on its behalf is directed to read this order and to signify in writing that he has read and understands it.

8. Filing sworn reports signed by both the Company and Union representatives with the Clerk of this Court with copies thereof to the Regional Director of the Board's 23rd Region every 30 days showing in detail the nature and course of the bargaining in summary form and appending thereto any written communications between the Union and the Company with respect to such bargaining. If either party has exceptions to the joint summary, separate additional reports setting forth differences may be filed. If upon investigation and analysis of such transcriptions the Board shall be of the opinion that the Company is not bargaining in good faith, it shall submit a report and supporting brief to the court and propose appropriate sanctions. If this court finds lack of good faith bargaining, a penalty consistent with paragraph 17 of this order will be imposed.

9. Reimbursing its employees for all losses and benefits as may have been lost by said employees by reason of the Company's refusal to execute the aforesaid agreement in January 1966, together with interest at the rate of six percent per annum. If the parties cannot agree on the amounts of losses sustained by the employees, the amounts shall be computed by the Board as a backpay proceeding and submitted to the court for further review. Because of the uncertainties involved in determining what benefit may or may not have been lost in the several years since 1966, we limit the backpay proceeding to the period and benefits of the contract which Schill unlawfully refused to sign and to those employees who would have benefitted during that contract period.

10. Mailing to the home of each of its employees presently employed and those previously employed directly af-

fected by this order, a copy of this order and of the notice attached hereto and providing the Board's Regional Director of the 23rd Region with proof of such mailing.

11. Upon request of the Union, immediately furnishing it with a list by name, address, job description, wage rate and date of hire of all the Company's employees since January 1, 1966, and maintaining said list in current status so long as the Union remains the exclusive bargaining representative for the employees in the designated unit.

12. Upon request of the Union made within six months from the date hereof, immediately granting to the Union and its representatives reasonable access to its bulletin boards and all places where notices to employees are customarily posted for a period of one year from the date of this order.

13. Upon request of the Union, affording it reasonable access to all non-work areas and appropriate facilities to communicate with employees in such area during non-work time. This is not intended to affect access to the plant to which the Union may be entitled by law during working time.

14. Issuing written instructions to its supervisors to comply with the provisions of the underlying decree and this order and to abide by the undertakings in the Notice attached hereto as an Appendix and requiring each supervisor to signify in writing that he has received such instructions. The records of compliance herewith shall be preserved and made available to the Board.

15. Posting in conspicuous places in its plant, including all places where notices to employees are customarily posted, for a period of 60 consecutive days, copy of this adjudication, and, alongside, copy of the Notice appended hereto as an Appendix. Said Notice shall be signed on behalf of the Company by its president and said copies of the adjudi-

cation and Notice shall be maintained in clearly legible condition throughout such posting period and respondents shall assure that they are not altered, defaced, or covered by any other material.

16. Reimbursing the Board for its costs and expenses, including counsel fees and salaries incurred in the preparation and presentation of these proceedings before the Special Master and this court. Said amount, unless agreed to by the parties, shall be fixed by further order of the court upon submission by the Board of a verified statement of such costs and expenses. The Company is also directed to pay all court costs, including all costs relative to the Special Master.

17. In order to assure compliance with the provisions of this order, it is further ordered that upon a failure of the Company, its officers and agents, to take the action and inaction herein provided, this court hereby imposes a compliance fine against the Company of $5,000.00 for each and every violation of the foregoing provisions, and a further compliance fine of $1,000.00 per day for each and every day each such violation continues. The court reserves jurisdiction to issue writs of body attachment or take such other appropriate action against any officer or agent of the Company responsible for non-compliance with the foregoing provisions of this order.

It is so ordered.

### APPENDIX

### NOTICE TO EMPLOYEES PURSUANT TO

A JUDGMENT OF THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

WE HEREBY NOTIFY all the employees of Schill Steel Products, Inc.

that on the _____ day of _____ 1973, the Company was ADJUDICATED IN CIVIL CONTEMPT by the United States Court of Appeals for the Fifth Circuit because the Court found that officers and agents of the Company disobeyed a judgment which the Court of Appeals entered against the Company on February 2, 1965, requiring the Company to comply with the provisions of two orders issued against it by the National Labor Relations Board. THESE ORDERS FORBID THE COMPANY, its officers, agents, successors and assigns from:

- Discouraging membership in United Steelworkers of America, AFL–CIO, by discharging or suspending employees or in any other manner discriminating against them.

- Interrogating employees as to their attitude towards or interest in the Steelworkers or otherwise interfering with, restraining or coercing employees in their rights to form, join or assist the Steelworkers or any other labor organization, or to refrain from any such activity.

- Refusing to recognize and bargain collectively in good faith with the Steelworkers.

We are now telling you sincerely that WE WILL NOT

- Violate the Board's orders as enforced by the judgment of the Court of Appeals by discharging employees, suspending employees, blaming the Union because the Company has refused to grant its employees wage increases, or by unlawfully withdrawing recognition from the Steelworkers Union.

- In any manner interfere with, restrain or coerce our employees in the exercise of their right to self-organization, to form, join or assist the Union or any other labor organization, to bargain collectively through representatives of their own choosing and to engage in any other concerted activity for the purpose of collective bargaining or mutual aid or protection, or to refrain from any or all of such activities.

WE WILL forthwith offer to Lionel Jackson and Paul Jones reinstatement to their former positions and WE WILL reimburse each of them for any loss of earnings suffered by them because of the discrimination against them. We will also reimburse Lionel Jackson and Robert Jones for loss of earnings suffered by them as a result of their discriminatory suspensions in 1967.

WE WILL recognize the United Steelworkers of America, AFL–CIO as the exclusive bargaining representative of our employees in the bargaining unit and will bargain with it in good faith and we will accord the Union and our employees all of the rights and privileges to which they are entitled under the Contempt judgment, posted alongside.

WE FURTHER NOTIFY our employees that we will in good faith comply in full with the judgment of the Court of February 2, 1965, and with all the provisions of the Contempt Adjudication which is posted alongside.

SCHILL STEEL
PRODUCTS, INC.

Dated _____ By _____
(Title)

THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced, or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Board's Office, Dallas-Brazos Building, 1125 Brazos Street, Houston, Texas 77002. Phone: 713–226–4296.