648 F.2d 233
 107 L.R.R.M. (BNA) 3043, 107 L.R.R.M. (BNA) 3191,
91 Lab.Cas. P 12,820
 FLORIDA STEEL CORPORATION, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FLORIDA STEEL CORPORATION, Respondent.
 Nos. 75-4027, 76-1743 and 76-3835.
 United States Court of Appeals,
Fifth Circuit.
 Unit B
June 15, 1981.
As Amended on Denial of Rehearing July 28, 1981.
 
 Charles F. Henley, Jr., William H. Andrews, Jacksonville, Fla., for Florida Steel Corp.
 William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul Elkind, Asst. Gen. Counsel for Contempt Litigation Peter Ames Eveleth, Deputy Asst. Gen. Counsel for Contempt Litigation, Anton Hajjar, Atty., NLRB, Washington, D.C., for NLRB.
 Jeffrey L. Gibbs, Elliot Bredhoff, Washington, D. C., for amicus curiae United Steelworkers of America.
 Petition for Adjudication in Civil Contempt and for Other Civil Relief.
 Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and LYNNE*, District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The allegedly unlawful conduct of Florida Steel Corp. (Florida Steel) now before us[1] is the showing of an anti-union videotape. The National Labor Relations Board (the Board) petitioned this court for an adjudication of civil contempt against the company on the ground that the showing violated three previous orders of this court,[2] prohibiting Florida Steel from, inter alia, in any manner interfering with, restraining or coercing employees in the exercise of their rights protected by Section 7 of the National Labor Relations Act in violation of § 8(a)(1).[3] The Special Master appointed by this court to make findings of fact and conclusions of law found that the company's use of certain portions of the videotape violated our previous orders. He recommended that Florida Steel be held in contempt and various remedies be imposed. The company here challenges the Special Master's conclusions; the Board in turn urges us to impose greater sanctions than those suggested.[4] We conclude that the Special Master correctly found Florida Steel in contempt and that the proposed remedies are sufficient. Hence, we adopt those recommendations.
 
 
 2
 Florida Steel manufactures, processes and sells steel and steel-related products. It maintains facilities at Tampa, Jacksonville, Miami, Fort Lauderdale, Fort Meyers, Orlando, and Indiantown, Florida; Charlotte and Raleigh, North Carolina; and Aiken, South Carolina.[5] The Steelworkers Union represents employees at the Charlotte and Indiantown plants. The instant controversy arose during that union's organizational campaign at the Tampa facility during which Florida Steel produced and exhibited a videotape designed to "prevent" employees from signing union authorization cards.[6] The film was aimed primarily at newly hired hourly employees although salaried and supervisory personnel were to view it as well. To produce the film, the company's Public Relations Manager, Bobbie Willis, hired an independent advertising and public relations firm that had previously done anti-union campaign work for the company. James Hogue, Vice President Industrial Relations, approved the finished product entitled "Look Out for the Cards" and directed that it be distributed to Florida Steel plants to be shown to all current employees and those hired in the future. Only those employees represented by the Steelworkers at Indiantown and Charlotte were excluded from this directive.[7] No active organizing, save minor activity at Jacksonville and Tampa, occurred after the videotape's distribution.
 
 
 3
 The Special Master found that two aspects of the videotape violated the earlier orders of this court: 1) the description of comparative wage increases given by the company at a union (Fort Lauderdale) and a non-union (Miami) plant; and 2) a segment suggesting that employees who had signed an attendance roster at a union meeting at the Indiantown facility were later forced to give testimony at a government hearing. The Special Master found that both of these segments violated § 8(a)(1) of the Act in that they contained "threats of reprisal"[8] as a result of union support. We agree.
 
 
 4
 In reaching these conclusions, the Special Master held that where the Board seeks an adjudication of civil contempt, it must do so by clear and convincing evidence. This is the proper standard of proof. N.L.R.B. v. Alamo Express, Inc., 395 F.2d 481 (5th Cir. 1968). Since this proceeding is in civil, not criminal, contempt, the company's intent is not at issue, only its actual compliance with this court's orders. N.L.R.B. v. Crown Laundry & Dry Cleaners, Inc., 437 F.2d 290 (5th Cir. 1971); N.L.R.B. v. Lawley, 182 F.2d 798 (5th Cir. 1950). We need not, therefore, address the question of wilfulness.[9] Finally, in reviewing the Special Master's findings of fact, we are bound by the clearly erroneous standard. Fed.R.Civ.P. 53(e)(2); N.L.R.B. v. J. P. Stevens & Co., Inc., Gulistan Div., 538 F.2d 1152 (5th Cir. 1976). Our review of those findings shows that they meet that standard.
 
 
 5
 The Supreme Court, in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), recognized an employer's right to comment on unionism or particular unions provided that such communications do not contain a "threat of reprisal or force or promise of benefit." Any prediction as to the consequences of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." Id. Furthermore, the evaluation of whether a prediction passes muster under the above standard must include consideration not only of the content of the employer's remarks but also the context in which they are made and their cumulative effect. "The question is not only what the employer intended to imply but also what the employees could reasonably have inferred." N.L.R.B. v. Kaiser Agr. Chem. Div. of Kaiser A & C Corp., 473 F.2d 374 (5th Cir. 1973).
 
 
 6
 In this light it is appropriate to review the company's past practices that might affect employees' interpretation of the challenged portions of the videotape. Since 1966 it has been the company's practice to conduct periodic wage surveys at each of its facilities and to grant wage increases varying between plants as a result of such surveys. Since 1974 this practice has been an established benefit known of and expected by employees. This and other courts have held unlawful Florida Steel's withholding of such wage increases from those employees who selected union representation. Florida Steel Corp., 220 NLRB 260 (1975), enf'd, 543 F.2d 1389 (D.C. Cir. 1976); Florida Steel Corp., 220 NLRB 1201 (1975), enf'd, 538 F.2d 324 (4th Cir. 1976); Florida Steel Corp., 221 NLRB 371 (1975), enf'd, 534 F.2d 1405 (5th Cir. 1976) (the Tampa case supra); Florida Steel Corp., 222 NLRB 955 (1976), enf'd, 536 F.2d 1385 (5th Cir. 1976) (the Jacksonville case supra).
 
 
 7
 The segment of the videotape dealing with wage increases described the company's practices at its Fort Lauderdale and Miami plants between 1970 and 1973. In 1970 Fort Lauderdale employees had voted for representation, Miami employees against. The script read:
 
 
 8
 At Fort Lauderdale, the Company was required by law to negotiate with the union before making any wage increase. Negotiations continued for 14 months at Fort Lauderdale with no agreement and no wage increase. In Miami, each employee averaged an increase of $500 in wages during the same 14-month period. Even when Fort Lauderdale employees wanted to accept a contract, the union refused because the Company would not agree to withhold union dues from employees' paychecks. After Florida Steel had negotiated with the union for 14 months with no agreement, the employees voted the union out. Then the Company was able to give wage increases without first bargaining with the union, just like they had been doing all along in Miami.
 
 
 9
 A similar set of events were then described as being repeated in 1972. Accompanying the spoken message was a visual display that in capsule form spelled out the harsh effects of unionization:
 
 
 10
 January 1970
 Ft. Lauderdale Miami
 -------------- -----
Employees voted Yes Employees voted No
 ("Yes" flashing on ("No" flashing on and
 and off) off)
No wage increase No delay in wage increases
 ("No" flashing on and off)
 * * * * *
 14 M-O-N-T-H-S
 * * * * *
 Union turns down contract because it
 did not include "check-off"
 March 1971
 Ft. Lauderdale Miami
 -------------- -----
Employees Voted Union OUT Improved Wages and
 --- Benefits
 * * * * *
 July 1972
 Second Union Election
 Ft. Lauderdale Miami
 -------------- -----
Employees vote Yes Employees vote No
 ("Yes" flashing on and ("No" flashing on and off)
 off) NO DELAY
No wage increase (flashing on and off)
 * * * * *
 12 M-O-N-T-H-S
 * * * * *
 Ft. Lauderdale Miami
 -------------- -----
Employees vote Yes Employees vote No
 ("Yes" flashing on and ("No" flashing on and off)
 off) NO DELAY
No wage increase (flashing on and off)
 * * * * *
 Union had only 5 meetings with Florida Steel
 * * * * *
 June 1973
 Union abandons employees
 
 
 11
 From these facts, and our own viewing of the tape, we agree with the Special Master that "(t)he clear implication of the videotape then is that, but for the Union's unwillingness to agree to the terms of the entire contract package offered by the Company, employees at Fort Lauderdale would have received the wage increases which were given at Miami."
 
 
 12
 This segment of the videotape also contained the following statement:
 
 
 13
 At Fort Lauderdale the Company was required by law to negotiate with the union before making any wage increases.
 
 
 14
 All parties agree that this sentence figures centrally in our determination of whether this portion of the tape violates our previous orders prohibiting violation of § 8(a)(1). We agree with the Special Master that the videotape's "clear implication" is that the above-quoted statement accurately describes the law. But, as noted above, this is not the law: four courts to date have held that Florida Steel may not withhold the periodic pay increases based on its annual surveys to union employees.[10] By implying that it may lawfully do so (or because employees could reasonably infer such from the film), Florida Steel threatened employees to the effect that electing a union would delay or prevent wage increases and other benefits that would otherwise be granted. In three previous cases,[11] we held that Florida Steel may not so threaten its employees; the company has thus acted in contempt of those decrees.
 
 
 15
 The second portion of the tape[12] the Special Master found violative of § 8(a)(1) concerns an incident that occurred prior to an election at the Indiantown plant in 1974. Hogue, in a memorandum to Willis, suggested that she develop a part of the tape "around the Indiantown situation where the employee may end up finding himself testifying in court." The finished script read:
 
 
 16
 The Sign the Union Card game is full of tricks. These tricks have been pulled on a number of Florida Steel employees. For example, (employees at Indiantown) were induced while attending a union meeting to sign an attendance roster and they ended up with their name on some kind of a volunteer organizing committee much to their surprise. These employees were told that their signing would not obligate or bind them in any way. It was just a list to record who attended the meeting. So, the union might use your name without permission, and if the union does use your name, you might end up having to testify at a public federal government hearing. The point is Don't Sign Anything not a card or an attendance record or anything else, unless you know what it means and what affect it could have on you, your job, and your relationship with the Company. (emphasis and capitalization in original script)
 
 
 17
 The Special Master found that this segment violated § 8(a)(1) in two respects: it implied that the union had misused the names of employees who had attended the union meeting, despite the fact that the Board, in 1975, had found that no such misuse had occurred, and second, the last sentence's admonition implied that an employee's attending a union meeting, testifying at a public hearing, or signing a union card might bear adversely on his job and his relationship with the company. We agree with the Special Master that these implications constituted a "concealed threat." That conclusion is easily reached with respect to the description of the Indiantown incident based as it was on facts found not to have occurred. With respect to the Special Master's determination regarding the last statement, the seemingly innocent caution that employees refrain from signing anything unless they know its meaning and effects, we turn again to Gissel. There, the Supreme Court illuminated some of the factors bearing upon the determination of whether an employer's statement constitutes a threat. Most important in the present context, we believe, is the nature of the relationship between employer and employee, the backdrop against which such statements are made:
 
 
 18
 (A)ny balancing of (an employer's rights of free speech and employees' rights to associate freely) must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.
 
 
 19
 In our judgment an employee viewing "Look Out for the Cards" might readily conclude from the last line of the above-quoted "lesson" that signing a union card or even an attendance roster at a union meeting might have adverse consequences upon his job in any of a number of ways including his longevity, grade, salary, and working conditions.[13] Though camouflaged with laudable aphorism, such threats are impermissible.
 
 
 20
 As a result of these conclusions, the Special Master recommended that Florida Steel be held in civil contempt and proposed a variety of remedies, including: 1) refraining from displaying "Look Out for the Cards" without first expurgating the two segments discussed above; 2) refraining from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights; 3) posting notices of the contempt adjudication; and 4) paying all costs and expenditures of the Board. The Special Master refused, however, to impose certain additional remedies requested by the Board, stating "this is a case of flagrant violation of the Court's judgments." In particular, he noted that Florida Steel had deleted the segment of the tape concerning wage increases at Miami and Fort Lauderdale in December 1978 after learning that the Board viewed it as impermissible. On appeal, the Board argues that the Special Master's conclusion was erroneous--Florida Steel flagrantly violated the court's orders--and that the additional remedies sought should therefore be imposed.[14]
 
 
 21
 In adopting this stance, the Board correctly notes that the proper aim of judicial sanctions for civil contempt is "full remedial relief," McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949), that such sanctions should be "adapted to the particular circumstances of each case," West Texas Utilities Co., Inc. v. N.L.R.B., 206 F.2d 442, 448 (D.C. Cir. 1953), and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal, Lance v. Plummer, 353 F.2d 585, 592 (5th Cir.), cert. denied, 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1965). Specifically, it urges this court to impose a prospective fine, union access, and notice distribution.[15]
 
 
 22
 The Board's essential argument in favor of a prospective fine is first, that such a fine is not an extraordinary remedy (as the Special Master concluded), and second, that it is the remedy that hits the company where it hurts most the pocketbook and thus the remedy most likely to be effective.[16] While we agree that prospective fines are a strong inducement toward compliance and have been imposed in certain instances where the company was not in flagrant violation[17] we deem such remedy unnecessary in the instant case. We agree with the Special Master's finding that "this is not a case of flagrant violation" and we believe that Florida Steel as a result of the remedies recommended by the Special Master will comply with this court's orders. We therefore reject the Board's request.
 
 
 23
 The Special Master concluded that "flagrant violation" of this court's judgments was not at hand primarily because Florida Steel had corrected that conduct forming the principal basis for his finding of contempt[18]: it had deleted the portion of the videotape discussing wage and benefit practices at Miami and Fort Lauderdale after learning that the Board viewed that segment as impermissible. The only remaining portion of the tape found contumacious was that relating to misuse of employees' names. Hence, he determined prospective fines, union access, and notice distribution were not necessary to insure the company's compliance.
 
 
 24
 The cases to which the Board directs us indicate that the standard to be employed in deciding whether or not to impose a compliance fine is whether such fine is necessary to "coerce the contemnor into compliance with [the] court's order." N.L.R.B. v. Vander Wal, 316 F.2d 631, 634 (9th Cir. 1963). Thus, in N.L.R.B. v. J. P. Stevens & Co., Inc., 563 F.2d 8 (2d Cir. 1977), the court held that strong arguments favored a compliance fine because Stevens had acted in contempt of its orders twice, with more than thirty individual violations.[19] Likewise, in N.L.R.B. v. Schill Steel Products, Inc., 480 F.2d 586 (5th Cir. 1973), we found a prospective fine appropriate where the company had a history of "extreme anti-union activities," id. at 594, and we found the challenged conduct a "flagrant attempt to avoid the consequences of an order of this court," id. at 596.[20] Since Florida Steel has already manifested a willingness to comply by deleting an objectionable portion of the videotape, we conclude that a prospective fine is not mandated.[21]
 
 
 25
 For like reasons, we conclude that union access and additional notice, i. e., mailing and reading aloud the court's order to employees, are not, as the Special Master concluded, necessary to effect full remedial relief. The Board's argument that these are the only ways in which the union can respond to the company's illegal assertions in the videotape fails because the posting of the Special Master's recommendations and this court's orders will serve as notice of the falsehoods and threats contained within the tape, and their illegality. Additionally, as the Special Master noted, no employee has viewed the segment of the tape dealing with Miami and Fort Lauderdale wage increases for the past two years. Under these circumstances and in light of our determination that a flagrant violation has not occurred, we conclude that the remedies recommended by the Special Master adequately correct the instant wrongs.
 
 
 26
 We therefore approve and adopt the Report of the Special Master recommending that Florida Steel be held in contempt. The motion of the Board for adjudication of respondent in civil contempt is thus granted. We direct respondent to purge itself of contempt by compliance with the remedies set forth within the Report and Recommendations of the Special Master.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 Florida Steel has a long history of litigation before this court. See infra. In an earlier case, we noted that "the controversy has gone on so long between (unions and the company) it reminds one of the legendary feud between the 'Hatfields and the McCoys.' " N.L.R.B. v. Florida Steel Corp., 586 F.2d 436 (5th Cir. 1978)
 
 
 [2]
 221 NLRB 371 (1975), enf'd, 534 F.2d 1405 (5th Cir. 1976). In this case, the Board found that the company violated § 8(a)(1) and (3) of the Act by refusing at its Tampa plant to institute its corporate-wide quarterly wage review policy and to grant wage increases thereunder to employees within the proposed bargaining unit covered by the union's election petition
 
 
 [222]
 NLRB 955 (1976), enf'd, 536 F.2d 1385 (5th Cir. 1976). Here, the Board found that the company violated § 8(a)(1) and (3) of the Act by delaying the regularly scheduled wage increases due its Jacksonville employees because the union had filed a petition for a Board election among these employees. The Board's order, as enforced by this court, required, in addition to its injunction that it refrain from violating § 8(a)(1) infra, that the company cease and desist from "withholding pay raises and/or fringe benefits from any of its employees throughout its entire operations corporate-wide because employees have chosen a union to represent them, or because a union has filed a petition for certification to become the bargaining representative for its employees."
 
 
 [224]
 NLRB 587 (1976), enf'd, 552 F.2d 368 (5th Cir. 1977). The Board here found that the company violated § 8(a)(1) and (3) by discharging and refusing to reinstate a Tampa employee because of his union activities and that it additionally violated § 8(a)(1) by coercively interrogating an employee, unlawfully polling employees during the representation election campaign and threatening an employee with loss of work if he voted for the union
 In a fourth case, not heard by this court, Board Case No. 12-CA-6881, Board Approved Settlement Stipulation October 21, 1977 (DS-1002), consent judgment entered March 7, 1978 (5th Cir. No. 78-1370) (Tampa), the Board entered an order, upon the settlement stipulation, requiring the company, inter alia, to cease and desist from "engaging or soliciting or employing Wackenhut corporation or any other internal intelligence investigators to engage in the surveillance of and to report on the union activities of its employees (in) any of its corporate-wide facilities." The stipulation additionally provided that "this settlement stipulation and ensuing Board Order or Court Decree may be used by the board in any other proceeding before the Board or an appropriate Court to the same extent as an adjudicated decision of the Board enforced by a United States Court "
 
 
 [3]
 29 U.S.C. Sec. 151 et seq.: Section 8(a)(1) of the Act (29 U.S.C. Sec. 158(a)(1)) states that it shall be an unfair labor practice "to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7." Section 7 (29 U.S.C. Sec. 157), reads in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection "
 
 
 [4]
 The Board does not contest the Special Master's conclusions with respect to those portions of the tape it earlier argued violated § 8(a)(1) and which the Special Master found benign
 
 
 [5]
 In addition, Florida Steel maintains several reinforcing and fabricating facilities throughout the Southeast
 
 
 [6]
 The memorandum James Hogue, Vice President for Industrial Relations, sent to Bobbie Willis, Public Relations Manager, defined the videotape's objective:
 To prevent the employee from signing a union authorization card whether he is approached by the professional union organizer or by a fellow employee
 (T)he prime objective is to make the employee apprehensive so that he will ask questions and not readily sign an authorization card whether it is put to him from a fellow employee or from a union organizer.
 
 
 [7]
 The company also did not air the film to employees at Orient Road, Tampa who had seen anti-union campaign material upon which the videotape was based
 
 
 [8]
 N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)
 
 
 [9]
 In Crown Laundry, writing for this court, Judge Wisdom stated:
 The absence of wilfulness on the part of the Company's top management cannot relieve the Company from civil contempt. The crucial issue in civil contempt proceedings, as distinguished from criminal contempt, is not the employer's state of mind but simply whether the Court's order was in fact violated. McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187 (190), 69 S.Ct. 497 (499), 93 L.Ed. 599, 604; N.L.R.B. v. Lawley, 5 Cir. 1950, 182 F.2d 798, 800. Since clear and convincing evidence supports the Special Master's conclusion that the Company, through its agent Baxter, has violated the Act and this Court's earlier order, we have no choice but to adjudge the Company in civil contempt.
 
 
 [10]
 Those decrees, two of which were pronounced by this court, may not be collaterally attacked in this contempt proceeding. Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948)
 
 
 [11]
 See note 2 supra
 
 
 [12]
 The videotape catechism-style is divided into "lessons." This segment is titled "Lesson $ 2."
 
 
 [13]
 The Special Master, in concluding that this segment violated § 8(a)(1), evinced his awareness that the statement in question must be viewed in the context of the tape in its entirety:
 Although the Company might argue that the intent of this segment was merely to insure that employees were fully aware of what they were in fact signing so that their actions would not be taken out of naivete or ignorance, one must ask the question how would a signature on a union document and a subsequent appearance at a government hearing affect the employee's job and relationship with the Company? In the context of an anti-union film, one is compelled to conclude that the intended message is that the job and the relationship would be in jeopardy. An isolated admonition to "be careful what you sign" is not what is presented by the videotape. It is a threat of adverse consequences to an employee who signs an attendance roster whether that threat pertains to the fear of testifying at a hearing or to the fear that the employee may lose his job.
 
 
 [14]
 The union, as amicus, strongly urges the same position
 
 
 [15]
 The Board requested the following remedies, respectively, regarding union access and notice distribution:
 1) Upon request of any union or unions made within six months from the date hereof, immediately granting to such unions and their representatives reasonable access to the Company's bulletin boards and all places where notices to employees are customarily posted for a period of one year from the date of such request, and afford such unions reasonable access to all non-work areas to communicate with employees in such areas during non-work time. This is not intended to effect or limit access to the Company's premises to which unions may be entitled by law during work-time.
 2) a. Mailing copies of said signed notice and contempt adjudication to each of its employees and providing to the Director of the Twelfth Regional Office of the Board a list of the names and addresses of all employees to whom said documents were mailed, together with proof of mailing; and
 b. Convening during working hours all of the Company's employees, reading to its employees the contents of the said Board notice in the presence of a Board representative
 
 
 [16]
 It notes that if a prospective fine is not levied here it may be imposed for future violations only via a criminal contempt proceeding, a far more difficult hurdle
 
 
 [17]
 E.g., N.L.R.B. v. Vander Wal, 316 F.2d 631 (9th Cir.1963); Philadelphia M. Tr. Ass'n v. Int'l Longshoremen Ass'n, 368 F.2d 932 (3d Cir.1966); O.C. & Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B., 547 F.2d 575 (D.C.Cir.1976) (as amended 1977)
 
 
 [18]
 In pointing to this fact, the Special Master noted that he did so not to denigrate the seriousness of the company's contumacious conduct but to formulate appropriate remedies
 
 
 [19]
 Stevens' violations had already been described as "massive, cynical, and flagrantly contemptuous." The Second Circuit wrote: "There is no need to add any further adjectives to this chorus." 583 F.2d at 25
 
 
 [20]
 The Board also directs our attention to N.L.R.B. v. Johnson Manufacturing Co. of Lubbock, 511 F.2d 153 (1975). There, too, we found the company in "flagrant contempt." Id. at 154. Johnson does not, however, lend support to the Board's argument for a prospective fine of the sort the Board seeks. In Johnson we did not impose a fine conditioned upon future noncompliance but rather a fine conditioned upon the employer's failure to purge himself of contempt by a specified date. The former, the remedy the Board requests here, is a harsher sanction in that it allows a fine for conduct not already found violative of the Act. Where a fine is conditioned on compliance with orders based upon a specific finding of contempt, the path the employer must take to avoid such fine is much more clear
 
 
 [21]
 The long history of litigation Florida Steel has had before this court, (n. 1 supra ) is not at variance with this conclusion. The remedy formulated, while not blind to the history of the company's union relations, must be proportionate to the illegal conduct at hand