RETIRED PERSONS PHARMACY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 567, 914, Dockets 74–1651, 74–1870.

United States Court of Appeals,
Second Circuit.

Argued April 9, 1975.

Decided July 2, 1975.

Roger S. Kaplan, New York City (Jackson, Lewis, Schnitzler & Krupman, New York City, on the brief, Robert Lewis, of counsel), for petitioner.

Robert G. Sewell, N.L.R.B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael W. Josserand, Atty., on the brief), for respondent.

Thomas Canafax, Jr., Chicago, Ill. (Gerard C. Smetana, Chicago, Ill., Milton Smith, Gen. Counsel, Richard Berman, Labor Relations Counsel, Washington, D. C., on the brief), for the Chamber of Commerce of the United States, amicus curiae.

Before HAYS, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

HAYS, Circuit Judge:

Retired Persons Pharmacy petitions this court to set aside a determination of the National Labor Relations Board holding it in violation of sections 8(a)(1) and 8(a)(5) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(1), (5) (1970). The Board cross-applies for enforcement of its order. We enforce the Board's order.

### I.

Petitioner is a corporation engaged in the sale and distribution of drugs to members of the National Retired Teachers Association and the American Association of Retired Persons. On November 29, 1971, after the Metropolitan Guild of Pharmacists had won an N.L.R.B. election of representatives by a vote of 20 to 10, the Board certified the Guild as the exclusive bargaining representative of the pharmacists employed by petitioner at its Washington, D. C. location. On September 1, 1972, petitioner and the Guild entered into a collective bargaining agreement which was to run from May 29, 1972, to May 29, 1973.

On March 7, 1973, the Guild notified petitioner that it intended to terminate the agreement at its expiration date and to modify its terms through collective bargaining. At a meeting on April 19, petitioner informed the Guild's attorney that it believed that the Guild no longer had the support of the majority of the employees. The next day petitioner filed a representation petition with the Board, but the petition was dismissed as untimely because it was filed within the sixty day insulation period prior to the expiration of the contract.[1] Since April 19, 1973, petitioner has refused to meet or bargain with the Guild.

On May 14, 1973, the Guild filed an unfair labor practice charge against the Pharmacy for refusing to engage in collective bargaining. A week later, attorneys for petitioner questioned 27 of the 28 unit members about their association with the Guild. The interviews began with a prefatory statement that the Pharmacy did not believe that the Guild represented a majority of its employees and that it was asking these questions in preparation for its defense against unfair labor practice charges. Petitioner's attorneys then proceeded to ask each of the employees to state his name and to answer 46 questions dealing with the Guild, the Guild's activities, and the employee's relationship with it. The em-

---

1. Under the Board's "contract bar" rule, a collective bargaining agreement operates as a bar to an election unless the petition is filed more than 60 but less than 90 days before the expiration date of the agreement. See Bally Case and Cooler, Inc. v. NLRB, 416 F.2d 902, 905 n.1 (6th Cir. 1969), cert. denied, 399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562 (1970); Leonard Wholesale Meats, Inc., 136 N.L.R.B. 1000, 1001 (1962).

ployees were told that they did not have to participate in the interviews and that their jobs would not be affected. Sixteen of the pharmacists chose to answer all or most of the questions. On May 22, the Guild filed an unfair labor practice charge alleging that the interviews constituted coercive interrogation as to the union activities of the employees in violation of section 8(a)(1) of the Act.

On May 30, the Pharmacy announced that the work week for pharmacists would be reduced by two hours. This change was made without notice to the Guild.

At the hearing on the unfair labor practice charges, the Pharmacy argued that it had withdrawn recognition of the Guild because it had a good faith reasonable doubt that the Guild continued to represent a majority of its employees. To substantiate this doubt, petitioner relied primarily on the testimony of Supervisor Brault and Manager Altman. Brault testified that in conversations with him, 14 out of the 28 pharmacists employed on April 19 had expressed dissatisfaction with the Guild. Altman testified that he too had had conversations with various employees who were dissatisfied with the Guild. Altman also testified that the Guild had been inactive since shortly after the collective bargaining agreement was signed.

The administrative law judge found that the Guild continued to be active during the life of the contract and that petitioner was aware of that fact. He also found that the statements of six of the 14 pharmacists included by Brault and Altman among those opposed to the Guild did not indicate lack of support for the Guild as bargaining representative. He concluded that petitioner had not shown the basis for a good faith reasonable doubt of the Guild's majority status. He therefore held that the Pharmacy had violated sections 8(a)(1) and (5) of the Act by refusing to bargain with the Guild after April 19 and by unilaterally changing working conditions. The administrative law judge also held that the interviews conducted on May 21 violated

section 8(a)(1) as coercive and were not justified either as a means of determining employee sentiment or as preparation for the defense of an unfair labor practice charge. In a brief order, the National Labor Relations Board affirmed the rulings, findings, and conclusions of the administrative law judge and adopted his recommended order that the Pharmacy cease and desist from all unfair labor practices, resume bargaining with the Guild, and post appropriate notices. Retired Persons Pharmacy, 210 N.L.R.B. No. 65 (1974).

## II.

A union which has been certified by the Board as the bargaining representative for a particular unit enjoys an irrebuttable presumption of majority status for one year, absent special circumstances. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). Following the one year certification period, there continues to be a presumption in favor of a union majority though the presumption is then rebuttable. See, e. g., NLRB v. Gallaro, 419 F.2d 97, 100 (2d Cir. 1969); NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir. 1966); Celanese Corp., 95 N.L.R.B. 664, 672 (1951). An employer who wishes to withdraw recognition from a certified union after a year may rebut the presumption of continued representation in one of two ways: 1) by showing that on the date recognition was withdrawn, the union did not in fact enjoy majority support, or 2) by presenting sufficient evidence to show that the refusal to bargain was based on a serious good faith doubt of the union's majority. See Allied Indus. Workers Local No. 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868, 881 (1973); Terrell Machine Co. v. NLRB, 427 F.2d 1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970), enforcing 173 N.L.R.B. 1480 (1969). It is well settled that in order to establish a good faith doubt the employer must present clear and convincing evidence of loss of union support capable of raising a reasonable doubt of

the union's continuing majority. See Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975), enforcing 210 N.L.R.B. No. 71 (1974); Retail, Wholesale and Dep't Store Union v. NLRB, 151 U.S.App.D.C. 209, 466 F.2d 380, 393 (1972); NLRB v. Frick Co., 423 F.2d 1327, 1330–31 (3rd Cir. 1970); Gulf Machinery Co., 175 N.L.R.B. 410, 413 (1969).

■ Petitioner contends that the testimony of Altman and Brault was sufficient to establish a reasonable doubt of the Guild's majority status. It argues, first, that the administrative law judge and the Board erred in holding that the remarks of at least six of the 14 employees who spoke to Brault did not indicate lack of support for the Guild. We disagree. Evidence of mere dissatisfaction with certain union activities does not lead to the conclusion that the complainer no longer wishes to be represented by the union for purposes of collective bargaining. See Gulf Machinery Co., supra at 413–14. See also Allied Indus. Workers Local No. 289 v. NLRB, supra at 881; NLRB v. Frick Co., supra at 1333–34 (crossing of union picket line indicating disagreement with strike not repudiation of union representation). The six employees in question indicated displeasure with the Guild's treatment of fellow employee Kim, complained about noisy Guild meetings, or indicated a lack of interest in Guild activities. Lack of interest in union activities or a disinclination to join the union does not imply opposition to the union as bargaining representative. See Terrell Machine Co. v. NLRB, supra at 1090. We accept the Board's conclusion that petitioner failed to show objective grounds for doubting that these six employees wished to be represented by the Guild.

■ Petitioner also argues that even without the six employees, to whose views we have referred, the conversations with the other eight provided sufficient justification for withdrawing recognition. Again, we disagree. The employer may rebut the presumption of continued majority status only by showing objective grounds for doubting that a *majority* of employees support the union. The fact, even if we were to accept the evidence as establishing such a fact, that eight of 28 employees do not support the union does not provide the basis for a serious doubt that the majority's preference has changed, particularly when ten employees voted against the union from the very start.

■ We reject the analogy, suggested by petitioner, between this case and that of a decertification petition filed by employees. The Board has decided that when 30% of the employees sign a decertification petition, there is generally "reasonable cause to believe that a question of representation . . . exists," § 9(c)(1) of the Labor Management Relations Act, 29 U.S.C. § 159(c)(1) (1970), and a decertification election may be held. 29 C.F.R. § 101.18 (1973). However, even the filing of such a petition does not necessarily allow the employer to cease bargaining. See Allied Indus. Workers Local No. 289 v. NLRB, supra at 881. Certainly when no such petition has been filed, the employer should not be permitted to stop bargaining on the ground that his conversations with employees leads him to believe that something less than 30% of them favor a change.

The Board's policies with regard to decertification and withdrawal of recognition are designed to balance the interest in stability of bargaining relationships and the interest in employee free choice in the selection of representatives. See NLRB v. Frick Co., supra at 1332. When an employer refuses to engage in collective bargaining allegedly in defense of the rights of his employees, it is proper for the Board to strike the balance differently from the situation when the employees themselves assert their own rights and demand a decertification election. Cf. Brooks v. NLRB, supra 348 U.S. at 103, 75 S.Ct. 176; NLRB v. Frick Co., supra at 1334–35. We hold that the Board's determination in this case, that the opposition to the union of eight of 28 employees does not permit an employer

to cease bargaining, is a proper exercise of the Board's broad administrative authority over the certification and decertification of bargaining representatives. See Brooks v. NLRB, supra 348 U.S. at 104, 75 S.Ct. 176; NLRB v. Leatherwood Drilling Co., 513 F.2d 270, 272 (5th Cir. 1975); NLRB v. Frick Co., supra at 1332; NLRB v. Gulfmont Hotel Co., supra at 589.

■ Petitioner further argues that by excluding certain testimonial and documentary evidence, the administrative law judge erroneously precluded it from proving its alternative theory that the union in fact did not enjoy a majority on the date recognition was withdrawn. The Pharmacy sought to call its employees as witnesses and to ask them if they desired union representation as of April 19. It also sought to subpoena union membership and financial records to determine if a majority supported the union. The administrative law judge ruled that the records were irrelevant. We agree. The issue to be decided was not how many employees belonged to the union or paid dues but rather whether a majority desired union representation for purposes of collective bargaining. Particularly where the contract does not provide for the checkoff of union dues or compulsory union membership, there is no necessary correlation between support for the union as bargaining representative, on the one hand, and the payment of dues or membership in the union, on the other. See NLRB v. Master Touch Dental Laboratories, Inc., 405 F.2d 80, 83 (2d Cir. 1968); Terrell Machine Co. v. NLRB, supra at 1090; NLRB v. Gulfmont Hotel Co., supra at 592.

■ The administrative law judge also refused to allow petitioner to call its employees in order to question them about their support for the union as of April 19. He held that such testimony would be highly unreliable because the employees would be testifying about their uncommunicated states of mind on April 19 knowing full well that their employer was staking its defense on their replies. We agree with the Board that the administrative law judge's decision was justified. By questioning its employees, whose position on the union was not known,[2] petitioner would clearly have been putting pressure on them to answer favorably. Cf. NLRB v. Gissel Packing Co., 395 U.S. 575, 608, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); International Union, UAW v. NLRB (Preston Products Co.), 129 U.S.App.D.C. 196, 392 F.2d 801, 807–08 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). If such questioning were allowed, management could withdraw recognition without basis and successfully defend itself by showing a lack of union support which in fact resulted not from employee dissatisfaction but rather from the withdrawal of recognition and subsequent proceedings. Cf. NLRB v. Frick Co., supra at 1334 n.15.

■ We are not persuaded by petitioner's argument that the approach adopted by the Board makes it difficult for an employer to rebut the presumption in favor of a certified union's continuing majority. The decision by the Board to permit the presumption to be rebutted was not intended to encourage employers to cease bargaining after a year. See Brooks v. NLRB, supra, 348 U.S. at 104 n.18, 75 S.Ct. 176. If an employer does cease bargaining, he must be prepared to meet a high standard of proof to justify his actions. See, e. g., Orion Corp. v. NLRB, supra, 515 F.2d at 85, and he should have such proof before he acts unilaterally. Because petitioner failed to meet the standard of proof, we affirm the holding of the Board that its refusal to bargain with the Guild and its unilateral institution of changes in work-

2. The May 21 poll conducted by petitioner's attorneys did not ask whether the employees wished to be represented by the union, nor was there any contact between petitioner and its employees on the subject between May 21 and the hearing.

ing conditions[3] violated sections 8(a)(5) and 8(a)(1) of the Act.

### III.

■ The Board also held that the interviews conducted by petitioner's attorneys on May 21 violated section 8(a)(1). Petitioner contends that we should reverse this holding because the interviews did not violate the standards set out by this court in Bourne v. NLRB, 332 F.2d 47 (2d Cir. 1964). We disagree.[4]

■ The rule in this Circuit is that employer interrogation is unlawful if it is coercive in light of all of the surrounding circumstances. See, e. g., NLRB v. Lorben Corp., 345 F.2d 346, 347–48 (2d Cir. 1965). Although several of the factors to be considered in making this determination were set out in Bourne,[5] that list was not intended to be exhaus-

tive. See NLRB v. Lorben Corp., supra at 347–48 (Bourne suggested "some of the many factors that must be considered anew in each case"). Nor does the absence of any one of the Bourne "indicia of coercive interrogation" exonerate the employer. See NLRB v. Gladding Keystone Corp., 435 F.2d 129, 132 (2d Cir. 1970); NLRB v. Rubin, 424 F.2d 748, 751 (2d Cir. 1970). Applying these principles, we hold that we should not overrule the Board's decision that the May 21 poll was coercive and that it violated section 8(a)(1).

■ Among the Bourne criteria are the nature of the information sought, the identity of the questioner, and the place and method of interrogation. See note 5 supra. Here the Pharmacy attorneys sought answers to 46 questions dealing, in great detail, with the employees' relationship with and fidelity to the Guild.[6] The one question which the poll

3. When a union loses its majority, an employer not only may cease bargaining with it, but also may institute unilateral changes in working conditions. To justify unilateral changes, however, the employer must be correct, and not merely reasonable, in his assessment of union strength. NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 719 (2d Cir. 1961); Stoner Rubber Co., 123 N.L.R.B. 1440, 1445 (1959).

4. The mere fact that the Board tested the interrogation by the standards it adopted in Struksnes Construction Corp., 165 N.L.R.B. 1062 (1967) does not prevent us from enforcing its order if we find a violation of § 8(a)(1) under the somewhat different rules applicable in this Circuit. Cf. NLRB v. Gladding Keystone Corp., 435 F.2d 129, 132–33 (2d Cir. 1970).

5. The factors discussed in Bourne were as follows:

"(1) The background, i. e., is there a history of employer hostility and discrimination?

"(2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?

"(3) The identity of the questioner, i. e. how high was he in the company hierarchy?

"(4) Place and method of interrogation, e. g., was employee called from work to the

boss's office? Was there an atmosphere of 'unnatural formality'?

"(5) Truthfulness of the reply."

332 F.2d at 48.

6. The 46 questions included in the poll were as follows:

*Name*

How long have you been employed at NRTA?

Are you a member of the Guild?

When did you become a member?

What did you do to become a member?

Do you actively support the Guild?

Are you presently paying monthly dues?

How much are the dues?

How do you pay these dues?

To whom do you pay these dues?

Were you paying dues in April 1973?

Were you paying dues before April 1973?

Were the dues ever increased?

Have you ever received an assessment?

When?

What was the assessment for?

How much was the assessment?

Does the Guild hold regular meetings?

How often are these meetings held?

Have you ever attended any of these meetings?

How often do you attend?

Did you attend meetings in April 1973?

Did you attend meetings before April 1973?

Does the Guild send out regular communications to its members?

was allegedly designed to answer, whether the employees wished to be represented by the Guild, was never asked. The questioning was conducted by the employer's attorneys, away from the normal workplace, and was prefaced with a formal statement including the fact that the union had brought unfair labor practice charges against the Pharmacy. Such probing questioning, in the context of unfair labor practice proceedings centering on whether the union commanded the support of the employees, was clearly coercive.

Relying on Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732, 743, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951), and decisions of the Board, petitioner argues that its poll was justified as necessary preparation for the forthcoming hearing on the unfair labor practice charge. However, as the court in *Joy Silk* recognized, an employer questioning his employees in preparation for such a hearing

"is restricted to questions relevant to the charges of unfair labor practice and of sufficient probative value to justify the risk of intimidation which interrogation as to union matters necessarily entails . . . ." 185 F.2d at 743.

What kind of communications are sent?
Have you ever received any communications from the Guild?
How many times?
Did you receive communications before April 1973?
Who is the President of the Guild?
Who are the other officers?
Who is your shop steward?
Do you know where the Guild is located?
If so, what is the address?
What is the telephone number of the Guild?
Do you have a copy of the Guild's Constitution and By-Laws?
Where is this copy?
When did you get the copy?
Have you ever read the Constitution and By-Laws?
When did you read it last?
What are the various provisions of the Constitution that you remember?
Do you know the terms of your contract with NRTA?
Do you have a copy of the contract?

As the administrative law judge found, petitioner's poll asked numerous questions which had little or nothing to do with the unfair labor practice charges. See note 6 supra. In addition, as pointed out above, the one most probative question, dealing with support for the union as bargaining representative, was never asked. Under such circumstances, the "risk of intimidation" greatly outweighed petitioner's need for the poll. An employer may not cease bargaining with the union, allegedly on the ground of lack of majority support, and then use the unfair labor practice proceedings as a pretext for a comprehensive interrogation which itself tends to discourage such support. See 210 N.L.R.B. No. 65 at n.2.

## IV.

Finally, petitioner argues for the first time before this court that it was denied due process by the Board's participation in proceedings for a preliminary injunction under § 10(j) of the L.M.R.A., 29 U.S.C. § 160(j) (1970).[7] The Board, before reaching its administrative decision, authorized its General Counsel on an *ex parte* presentation to file for a preliminary injunction in the District Court under § 10(j). Petitioner contends that this combination of prosecutorial

Did the Guild ever tell you about the contract?
If so, when?
Do you know when the contract expires?
Have you ever had a grievance handled by the Guild?
Was the grievance handled satisfactorily?

7. Section 10(j) of the L.M.R.A., 29 U.S.C. § 160(j) (1970) provides as follows:
   "The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

and adjudicative functions and the *ex parte* consideration by the Board of relevant facts violates the Fourteenth Amendment, as well as the intent of Congress. Because of petitioner's failure to raise this issue before the Board, we must decline to consider it. See § 10(e) of the L.M.R.A., 29 U.S.C. § 160(e) (1970). We cannot agree with petitioner that because the § 10(j) proceedings were not part of the administrative record, it was excused by "extraordinary circumstances" from presenting its objection to the Board.

We also find no merit in petitioner's argument that the Board's order should be reversed because of the administrative law judge's refusal to sever the hearing on the May 21 poll from the rest of the proceedings.

The order of the National Labor Relations Board is enforced.