HAYS, Circuit Judge:
Petitioner, the National Labor Relations Board (the NLRB or the Board) seeks enforcement of an order, 230 N.L.R.B. No. 156 (1977), entered pursuant to Sections 8(a)(5) and (1) and Section 10 of the National Labor Relations Act[1] (the Act), requiring Re *808 spondent, Windham Community Memorial Hospital and Hatch Hospital Corporation (the Hospital): to cease and desist from certain unfair labor practices; to recognize and bargain, on request, with Windham Community Memorial Hospital, Registered Nurses Unit 62, Connecticut Nurses Association (the Union); and to reinstate with back pay, or otherwise make whole, all striking employees. We reject the Hospital’s arguments in opposition to this petition and enforce the NLRB’s order in all respects.
I
On August 7, 1975, non-supervisory nurses employed at the Hospital held an election. A two-thirds majority of those voting selected the Connecticut Nurses Association as their collective bargaining representative.[2] The Union was certified by the NLRB on August 15, 1975, and negotiations commenced on November 6, 1975. After several negotiating sessions, major issues remained unresolved and the Union voted to engage in an economic strike. The strike commenced on April 21,1976. Negotiations continued for a time, but were suspended on June 9, 1976.
On August 23, 1976, Mary Lou Millar, a Union agent, called Robert B. Snow, Jr., the Hospital’s attorney and a member of the negotiating team, and told him that the Union would like to resume bargaining. The substance of this conversation is disputed: Snow alleges that he was told that resumption of negotiations was preconditioned on reinstatement of 23 employees and on the Union’s “getting something to show for the strike”; Millar claims that she merely indicated the Union’s willingness to make certain concessions, such as reducing the number of employees to be immediately reinstated from 42 to 23 and altering wage demands.
Snow immediately contacted the Hospital’s administrator, Frank E. Ritchie, and communicated the Union’s desire to resume negotiations. At that time, Ritchie advised Snow that the Hospital would no longer negotiate with the Union because it felt that the Union no longer had the support of a majority of the Hospital’s employees. Later that day, the Union learned that the Hospital had refused to bargain and had withdrawn recognition from the Union.
It is undisputed that approximately 57 employees initially engaged in the strike; that 9 striking employees returned to work before August 23, 1976; and that by August 23, 1976, the Hospital had hired 42 replacement employees. The Administrative Law Judge, in findings adopted by the NLRB, set the number of employees who never went on strike at 15 [3] and the number of striking employees who resigned prior to August 23, 1976, at 6.[4] It is undisputed that the quality and quantity of picketing gradually diminished over the months, and that such activities were officially terminated by the Union on August 6, 1976. The significance of this diminution, however, is hotly contested. The Hospital claims that the Union abandoned the strike and that diminution in enthusiasm for picketing indicates diminution in support for the Union. The Union claims, however, that the reduction of picketing activity is attributable to the combination of several different factors: summer vacations, family responsibilities engendered by school vacations, and the strikers’ feelings that additional picketing was no longer necessary because the continuation of the strike itself was sufficient to notify the Hospital that the Union was still pressing its claims.
*809 On October 4, 1976, the Union filed an unfair labor practice charge against the Hospital, alleging a refusal to bargain in violation of Section 8(a)(5) of the Act. A hearing was held before an Administrative Law Judge of the NLRB on March 15,1977. In a decision issued on May 9, 1977,[5] the Administrative Law Judge made certain findings of fact and concluded that the Hospital had improperly refused to bargain on August 23, 1976; it had failed to prove that its withdrawal of recognition was justifiable under the standards established by the NLRB and the courts. He also found that the Hospital’s misconduct had converted the Union’s economic strike into an unfair labor practice strike, thus making reinstatement of strikers an appropriate remedy.[6]
The NLRB' adopted the Administrative Law Judge’s opinion with modifications,[7] and purported to clarify its policy with respect to the presumptions of Union support concerning striker replacements. Windham Memorial Community Hosp. and Hatch Hosp. Corp., 230 N.L.R.B. No. 156 (1977). It entered the above-described order for which it now seeks enforcement. The Hospital opposes enforcement, arguing that its refusal to bargain with the Union was the proper response to the Union’s allegedly preconditioned offer to return to the bargaining table, that its withdrawal of recognition of the Union was based on a serious good faith doubt of the Union’s majority status, and that reinstatement of strikers and payment of back pay are inappropriate remedies because there is not sufficient evidence in the record to support the NLRB’s finding that the Hospital’s alleged misconduct converted the economic strike into an unfair labor practice strike.
II
The applicable standard of consideration on a petition for enforcement of an NLRB order is whether the NLRB’s findings are “supported by substantial evidence on the record considered as a whole . . .” 29 U.S.C. § 160(e) (1970). See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Hospital argues that no such evidence supports the NLRB’s finding that the Hospital violated Sections 8(a)(5) and (1) of the Act by refusing to bargain with and withdrawing recognition from the Union.
The Hospital first contends that its failure to return to the bargaining table in response to the Union’s August 23rd initiative did not constitute a “refusal to bargain” within the meaning of Section 8(a)(5) of the Act. It seeks to justify its refusal by alleging that the Union’s offer was preconditioned and by arguing that the Act does not require the Hospital to accept such an offer. The Hospital states that “neither the Administrative Law Judge nor the Board made any finding with regard to the precondition.”
It is not at all clear from the record that no finding on this question was made. At the hearing before the Administrative Law Judge, witnesses Millar and Snow offered contradictory testimony about the substance of the August 23rd telephone conversation,[8] thereby establishing that the nature of the offer to resume negotiations was in dispute. And, while the Administrative Law Judge did not specifically state that he found that no condition had been imposed by the Union, his finding of fact with re-
*810 spect to the telephone call indicates that he credited Millar’s rather than Snow’s version of the exchange. He found the substance of Millar’s communication to be “that some movement could be made with regard to the matter of wages and the formula by which Respondent would take back the striking employees.” Windham Memorial Community Hosp. and Hatch Hosp. Corp., 230 N.L.R.B. No. 156, ALJ at 4 (1977). Thus, he apparently found as a fact that the discussion dealt not with preconditions to negotiating, but with offers to compromise in the areas of wage demands and striker reinstatement. The NLRB did not disturb this finding.
Even if the Administrative Law Judge’s opinion is not read as resolving the dispute as to the nature of the offer to return to the bargaining table, denial of the petition for enforcement or remand for a specific ruling on this question is not required. While it has been held by the NLRB that the imposition by one party, as a condition precedent to agreement, of a condition which can be lawfully refused by the other party permits the other party to refrain from negotiating until the condition is withdrawn, Midwestern Instruments, Inc., 133 N.L.R.B. 1132, 1140-41 (1961), the Hospital cannot benefit from this rule. It did not meet with the Union, as did the employer in Midwestern Instruments, to voice its objections to the imposition of the alleged conditions, nor did it inform the Union that it would not negotiate under those conditions. Instead of merely refusing to bargain until the alleged conditions were withdrawn, the Hospital chose immediately to withdraw recognition from the Union.[9] Even under the Hospital’s version of the August 23rd telephone conversation, this was not an appropriate response.[10] Then, unless the withdrawal of recognition was justifiable under some other theory, it clearly constituted a “refusal to bargain” within the meaning of Section 8(a)(5) of the Act.
Ill
Except under “unusual circumstances,” a union’s representative status is irrebuttably presumed to continue during the first year following certification, so that the collective bargaining relationship has the opportunity to become established. Brooks v. NLRB, 348 U.S. 96, 98-104, 75 *811 S.Ct. 176, 99 L.Ed. 125 (1954). Withdrawal of recognition during this period is an unfair labor practice and violates the Act. Id. Following the expiration of the certification year, the presumption remains in effect but becomes rebuttable. See, e. g., Nazareth Regional High School v. NLRB, 549 F.2d 873, 879 (2d Cir. 1977); Retired Persons Pharmacy v. NLRB, 519 F.2d 486, 489 (2d Cir. 1975); NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir. 1966); Celanese Corp., 95 N.L.R.B. 664, 672 (1951). The employer may rebut this presumption of continued majority status in either of two ways:
1) by showing that on the date recognition was withdrawn, the union did not in fact enjoy majority support, or 2) by presenting sufficient evidence to show that the refusal to bargain was based on a serious good faith doubt of the union’s majority.
Retired Persons Pharmacy v. NLRB, 519 F.2d 486, 489 (2d Cir. 1975).[11]
 To rebut the presumption by establishing its good faith doubt, “the employer must present clear and convincing evidence of loss of union support capable of raising a reasonable doubt of the union’s continuing majority.” Id. at 489-90. See also Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975); NLRB v. Frick Co., 423 F.2d 1327, 1330-31 (3d Cir. 1970); Gulf Machinery Co., 175 N.L.R.B. 410, 413 (1969). This is essentially an objective test, although “subjective evidence may be used to bolster the argument that such doubt existed at the relevant time.” Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975). See also NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir. 1966). This question of reasonable doubt is a question of fact; the NLRB’s determination must be affirmed if supported by substantial evidence in the record as a whole. Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975); Allied Industrial Workers v. NLRB, 155 U.S.App.D.C. 112, 127, 476 F.2d 868, 883 (1973).
Here it is undisputed that the Hospital withdrew recognition from the Union on August 23, 1976, a few days after the expiration of the certification year. Thus, the presumption favoring continued representative status was rebuttable. We find, as developed below, however, that the Hospital did not rebut the presumption in either of the prescribed ways.
A
The Administrative Law Judge ruled that the Hospital had failed to establish that, as of August 23, 1976, the Union was in fact no longer supported by a majority of the Hospital’s employees. Of the 57 original strikers, he determined that 9 returned to work and 6 resigned before August 23, 1976, leaving a total of 42 strikers. He found that, for purposes of determining majority status, all 42 strikers were members of the bargaining unit and could be presumed to support the Union. To the 15 non-strikers and the 9 strikers who returned to work before the operative date, he applied the established presumption that they supported the Union in the same 2 to 1 ratio by which the employees originally voted for the Union. This totalled 58 employees in favor of the Union, 42 strikers and 16 of the 24 non-strikers and returnees. Thus, he noted that even if it were assumed that *812 the 42 replacements did not support the Union, a majority of employees still did so; at most 50 of the 108 employees in the bargaining unit might be counted to be against the Union.
While agreeing with the Administrative Law Judge’s ultimate conclusion that the presumption of continued majority status had not been rebutted by actual proof of lack of support, the NLRB disagreed with his treatment of striker replacements. The NLRB took the opportunity to “clarify the law on this issue.” Windham Memorial Community Hosp. and Hatch Hosp. Corp., 280 N.L.R.B. No. 156, N.L.R.B. at 2 (1977). It stated its “general rule” that “new employees, including striker replacements, are presumed to support the union in the same ratio as those they have replaced. See, e. g., Surface Industries, Inc., 224 N.L.R.B. 155 (1976); James W. Whitfield d/b/a Cutten Supermarket, 220 N.L.R.B. 507, 508-09 (1975) .” Id. It then stressed that its departure from this principal in a recent case, Arkay Packaging Corp., 227 N.L.R.B. 397 (1976) , petition denied sub nom. New York Printing Pressmen v. NLRB, 575 F.2d 1045 (2d Cir. 1978), was based on special circumstances not present here and should not be read as a repudiation of the “general rule.” Application of this presumption would place 28 of the replacement employees in the pro-Union category and overwhelmingly defeat any attempt to establish actual lack of majority support.
The NLRB agreed with the Administrative Law Judge’s finding that non-strikers and returnees may not be presumed to be against the Union. It found fault with his use of the presumption of 2 to 1 support for the Union among these 24 employees, however, insofar as that presumption placed 8 of these employees in an anti-Union category. The NLRB stated that such use of this presumption “would . . . permit [the Hospital] to rely on a presumption, rather than an objective factor, in assessing support for the Union.” [12] It did not reject the Administrative Law Judge’s affirmative use of presumptions to establish that the Hospital had not met its burden of proving actual lack of majority support. Apparently, it felt that 16 of the 24 nonstrikers and returnees could be presumed to support the Union, but that no assessment of the loyalties of the other 8 employees could be made on the record before it. Except for these comments and modification of the Administrative Law Judge’s relief order, the NLRB adopted the Administrative Law Judge’s opinion.
The Hospital asserts that the NLRB erred in two respects. First, it argues that those strikers who had found other employment prior to August 23, 1976, or who did not want to return to work at the Hospital, should not be considered members of the unit for purposes of determining actual majority status. It claims that only the 23 striking employees mentioned in Millar’s August 23rd telephone call wanted their jobs back. The Union, on the other hand asserts that its request was for immediate reinstatement of 23 employees, a softening of its original position that all strikers be reinstated immediately. Second, the Hospital contests the NLRB’s position on the striker replacement presumption. It asserts that this case is not sufficiently distinguishable from Arkay Packaging to permit use of the “general presumption” here. It seeks, instead, a presumption that none of the replacements supported the Union.
*813 In order to prevail, the Hospital must be sustained on both of these claims. If the number of strikers in the unit is 23 rather than 42, the unit would consist of 89 rather than 108 employees. Of those 89, it is uncontested that 39 employees, the 23 strikers and 16 of the 24 non-strikers and returnees, belong in the pro-Union category. Application of the NLRB’s striker replacement presumption, however, would add 28 of the replacements to that category and raise the total to 67, a clear majority. The presumption sought by the Hospital, however, would remove those 28 replacements and leave 39 employees, less than a majority. The operation of the presumption in this fashion only benefits the Hospital if the unit consists of 89 rather than 108 employees, and only 23 of these are active strikers. Thus, rejection of either of the Hospital’s assertions defeats its position. We find neither claim supportable.
As to the number of striking employees to be considered part of the unit for purposes of determining majority status, the rule is clear that the unit includes all strikers, even if permanently replaced. See NLRB v. Crimptex, Inc., 517 F.2d 501, 503-04 (1st Cir. 1975); C. H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983, 986 (5th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970). The Administrative Law Judge found that only 6 strikers had resigned prior to August 23, 1976, and he reduced the unit and the number of strikers by that amount when he determined that 42 employees remained on strike. He also found that the 23 employees mentioned in Millar’s telephone conversation with Snow referred merely to the fact that “movement could be made with regard to the formula by which the [Hospital] would take back the striking employees.” Windham Community Memorial Hosp. and Hatch Hosp. Corp., 230 N.L.R.B. No. 156, ALJ at 4 (1977). Thus, he implicitly determined that more than 23 employees sought reinstatement. These rulings are findings of fact which are supported by substantial evidence in the record as a whole; they should not be disturbed. Therefore, the Hospital cannot prevail in its contention that only 23 strikers should be included in the unit for purposes of determining majority status.
The Hospital’s second argument completely misconceives the nature of the employer’s burden of proof. The Hospital must prove, by affirmative evidence, that, as of August 23, 1976, the Union did not in fact enjoy majority support. As noted by the NLRB in its opinion in this case, this burden can be sustained only by objective evidence and presumptions do not provide such evidence. Thus, even if the NLRB’s use of presumptions was incorrect, this is irrelevant to the Hospital’s case unless it can offer the necessary objective proof.
Instead of providing such proof, however, the Hospital merely formulates a presumption of its own: that no replacement employee supports the Union. This presumption is equally, if not more, assailable than the NLRB’s; many workers might well be pro-Union but might need the job or might reject the use of strikes in nursing. Considering the propriety of the Administrative Law Judge’s findings of fact on the question of unit membership and the Hospital’s failure to offer objective proof, it is clear that the Hospital did not, by actual proof of lack of majority, rebut the presumption of continued representative status.
B
The Hospital urges several separate objective criteria which, it alleges, individually, or taken together, formed a “compelling basis for a good faith doubt.” These criteria, however, consist of ambiguous evidence to which the Hospital consistently gives the interpretation most favorable to its position. As such, they cannot form the basis of genuine doubt.[13]
The primary ground cited by the Hospital was alleged diminished support for the Union evidenced by the facts that some employees never went out on strike, some *814 strikers returned to work prior to August 23, 1976, and striker replacements had been hired and had been willing to cross the picket line. We find this argument unconvincing. It cannot be presumed that repudiation of a strike or the willingness to cross a picket line is also repudiation of the Union as a bargaining agent. This is especially true in employment which is so closely involved with health and safety; many nurses consider strikes completely improper.
The Hospital also based its alleged good faith doubt on employee and replacement employee statements reflecting rejection of the Union and/or the strike. The record reveals, however, that most of these statements concerned disapproval of the strike as a bargaining technique and not of the Union in general. The mere verbalization of disapproval of the Union’s tactics cannot be termed objective evidence of erosion of support for the Union.
The Hospital’s other bases for its alleged doubt are equally unpersuasive. The Administrative Law Judge found that the reduction and eventual elimination of picketing activity could easily be attributable to factors other than rejection of the Union. The failure of the Union to communicate with the Hospital during most of the summer months also does not provide grounds for doubt. On August 23, 1976, the Union evidenced an interest in resuming negotiations; the withdrawal of recognition did not occur until after Millar’s telephone call would have dispelled any doubts engendered by the Union’s inaction.
Coupled with this absence of reasonable grounds on which to base a doubt was some evidence indicating lack of good faith. The Administrative Law Judge noted Hospital Administrator Ritchie’s testimony that the decision to withdraw recognition was made before the end of the certification year and was improperly based in part, at least, on his desire not to bargain with the Union. Ritchie testified that he was very dissatisfied with the course of bargaining and that he was reluctant to bargain any more with the Union. As noted by the Administrative Law Judge, however, “[dissatisfaction with the course of bargaining is [neither] grounds for withdrawing recognition [n]or ... an objective consideration upon which to conclude that a union no longer represents a majority.” [14]
In sum, we concur with the Administrative Law Judge’s findings that the Hospital did not advance sufficient objective criteria on which to base a good faith doubt of the Union’s majority status. This finding of insufficiency is supported by substantial evidence on the record as a whole. The Hospital did not rebut the presumption that the Union enjoyed majority status on August 23, 1976, and thus, its withdrawal of recognition on that date was a violation of Section 8(a)(5) of the Act.
IV
It is well-established that an economic strike is converted into an unfair labor practice strike if it is “prolonged or aggravated by the employer’s unfair labor practice . . . .” NLRB v. Remington Rand, Inc., 130 F.2d 919, 928 n.8 (2d Cir. 1942); General Teamsters, Local 992 v. NLRB, 138 U.S.App.D.C. 312, 317, 427 F.2d 582, 587 (1970). Reinstatement of all striking employees, with or without back pay, is an appropriate remedy when an unfair labor practice strike is found. 29 U.S.C. § 160(c) (1970).
The Hospital requests denial of enforcement of the portion of the NLRB’s order which requires reinstatement and back pay. It contends that nothing in the record indicates prolongation or aggravation of the strike by the withdrawal of recognition from the Union. There is, however, ample evidence to support a finding that the strike was prolonged by this action. Withdrawal of recognition from the Union precluded the possibility that the strike *815 could be ended by negotiation. Thus, the concededly economic strike was converted to an unfair labor practice strike and reinstatement and back pay are entirely appropriate remedies.
The order will be enforced in all respects.

. Section 7 of the Act, 29 U.S.C.. § 157 (1970), provides, in pertinent part:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection .
Section 8(a) of the Act, 29 U.S.C. § 158(a) (1970), provides, in pertinent part:
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
******
ís) to refuse to bargain collectively with the representatives of his employees .
Section 10 of the Act, 29 U.S.C. § 160 (1970), provides, in pertinent part:
(a) The Board is empowered ... to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. .
******
(c) . . If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an *808 order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter.
* * * * * *

. The actual vote was 38-19 in favor of the Union. As of the date of the election, the Hospital employed approximately 65 non-supervisory nurses.

. Windham Community Memorial Hosp. and Hatch Hosp. Corp., 230 N.L.R.B. No. 156, ALJ at 3 (1977).

. Id.

. id.

. The Administrative Law Judge did not, however, include reinstatement in his remedial order.
The opinions of the Administrative Law Judge and the NLRB will be discussed in greater detail in the body of the opinion.

. The NLRB disagreed with the Administrative Law Judge’s treatment of the presumptions of union support applicable to striker replacements. See IIIA infra. It also stated that the Hospital should not be permitted to rely on presumptions in establishing its good faith doubt of majority status. See text at note 12 infra. Finally, the NLRB modified the Administrative Law Judge’s remedy to include reinstatement of striking employees and back pay.

. Transcript of Hearing Before Administrative Law Judge, Windham Community Memorial Hosp. and Hatch Hosp. Corp., at 20-25, 32-36, 38-44, and 106-08 (March 15, 1977).

. The Hospital cites other cases which are even less helpful to its position. In Royal Typewriter Co. v. NLRB, 533 F.2d 1030 (8th Cir. 1976), for example, the court determined that the imposition by the employer of “unlawful conditions on bargaining clearly violated Sections 8(a)(1) and (5) of the Act.” Id. at 1037. It did not, however, rule on the relationship between these violations and the union’s duty to bargain with the employer.' Moreover, the Royal Typewriter fact pattern, involving a condition imposed by an employer, does not create the possibility of withdrawal of recognition from the union, an important factor present in the instant case.
NLRB v. Pepsi-Cola Bottling Co. of Miami, 449 F.2d 824 (5th Cir. 1971), cert. denied, 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972), involved an alleged conditional offer which the trial examiner found to be “presented . not as an unconditional demand, but rather as a bargainable issue.” Thus, it determined that the employer was not excused from further bargaining by the nature of the offer. It did not state, however, that the employer would have been excused had a condition been imposed and had the employer not sought withdrawal of that condition.

. Moreover, there is language in at least one case which indicates that the unlawfully conditional nature of an offer to negotiate will not justify a refusal to bargain if the refusal is actually motivated by some other, improper purpose. The court in NLRB v. Pepsi-Cola Bottling Co. of Miami, 449 F.2d 824, 830 (5th Cir. 1971), cert. denied, 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972), noted that the establishment of the alleged condition was not the real cause of the employer’s refusal to bargain but that his “purpose was to avoid bargaining with the union and subvert its influence
Here, the Hospital’s failure to cite, at the time of its refusal to return to the bargaining table and its withdrawal of recognition from the Union, the alleged preconditions as the basis of these decisions suggests the ex post facto nature of this justification. Nowhere in the record is there evidence that, at the time the offer to resume negotiations was made by the Union, the Hospital was in any way displeased with the nature of the offer. It now appears that the Hospital is seeking to excuse its behavior which was actually motivated by a desire not to negotiate further with the Union. See text at note 14 infra.

. Proof of actual absence of majority status on the date recognition was withdrawn from the union is an absolute defense to an 8(a)(5) charge. See Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975). The NLRB has recently stated that a finding that an employer had a good faith doubt of continuing majority status also "constitutes a complete defense to the allegations of unlawful refusal to bargain. . ” Arkay Packaging Corp., 227 N.L.R.B. 397, 398 (1976), petition denied sub nom. New York Printing Pressmen v. NLRB, 575 F.2d 1045 (2d Cir. 1978). See NLRB v. Dayton Motels, Inc., 474 F.2d 328, 331-32 (6th Cir. 1973), petition enforced after remand, 525 F.2d 476 (6th Cir. 1975). Some courts have stated, however, that only a partial defense is afforded; proof of an employer’s good faith doubt shifts the burden to the General Counsel to prove that the union actually enjoyed majority status on the date recognition was withdrawn. See Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir. 1975). Because we find that the Flospital did not establish good faith doubt, see Section IIIB infra, we do not reach the question of the nature of the defense.

. At the point in the Administrative Law Judge’s opinion where he employed the presumption in this manner, it appears that he was assessing the possibility that the Hospital had established actual absence of majority status. The NLRB apparently failed to recognize the distinction the Administrative Law Judge drew between the two methods of rebutting the presumption of continuing representative status; it noted that the Administrative Law Judge had utilized this presumption in “determining whether [the Hospital] had objective considerations sufficient to withdraw recognition.” The argument in opposition to employer use of presumptions, however, is applicable to either rebuttal technique. If the evidence offered as proof of actual absence of majority status is insufficient, it will still be considered in support of the employer’s assertion of good faith doubt. Thus, if a presumption cannot support good faith doubt, it clearly cannot serve as actual evidence of absence of majority status.

. Any effort by the Hospital to use presumptions to establish its good faith doubt should also be rejected. See note 12 and accompanying text supra.

. Windham Memorial Community Hosp. and Hatch Hosp. Corp., 230 N.L.R.B. No. 156, ALJ at 6 (1977).