577 F.2d 513
 98 L.R.R.M. (BNA) 3317, 84 Lab.Cas. P 10,742
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CORNELL OF CALIFORNIA, INC., Respondent.
 No. 76-1545.
 United States Court of Appeals,
Ninth Circuit.
 June 14, 1978.
 
 Elliott Moore, Washington, D.C., for petitioner.
 George King and Arthur W. Ruthbenbeck of Boornazian & Schulze, Oakland, Cal., for respondent.
 Petition for Enforcement of Order of the National Labor Relations Board.
 Before DUNIWAY, CUMMINGS,* and SNEED, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order requiring respondent Cornell of California, Inc. to recognize and upon request bargain with the Northern California Joint Board, Amalgamated Clothing Workers of America. Because the Company does not dispute that it refused to bargain but rather insists that its refusal was lawful, the key question is whether substantial evidence supports the Board's finding that Cornell had no good faith doubt of the Union's majority status sufficient to relieve Cornell of the legal obligation to recognize the Union and to bargain under Sections 8(a)(1) and 8(a)(5) of the Act (29 U.S.C. §§ 158(a)(1) and 158(a)(5)). We think that question must be answered in the affirmative and therefore grant the Board's petition.
 
 
 2
 The facts that led the Board to order recognition and bargaining begin with the Company's recognition of the Union in 1971. In October of that year, the Company and the Union executed a collective bargaining agreement effective through December 31, 1974. In September of 1974, the Union requested by letter that the Company bargain with the Union over terms for a new contract.
 
 
 3
 Foreshadowing the events that followed, the Company did not respond to the Union's request. Apparently the parties initially delayed meeting due to the hospitalization of Company President Cornell, but when Union Business Manager Siegel met with Cornell in October he was told the Company could not "live with" the agreement. A few days later the Company petitioned for a Board election, and in November the Company ceased checking off Union dues, even though the checkoff agreement was still in effect. At least in part based on these actions, on November 7, 1974, the Union filed the unfair labor practice charge that led to this proceeding.
 
 
 4
 About three weeks after filing the charge, Siegel met with Cornell and was told again after presenting the Union's demands that Cornell "could not live with it." Shortly thereafter, the Company's attorney, George King, told Siegel that the Company would meet with him if the Union would agree to hold an election. Siegel refused.
 
 
 5
 In January, after the 1971 contract had expired, Siegel demanded that unilateral changes in the terms and conditions of employment not be made and informed Cornell at a luncheon meeting that it still was not too late to bargain. With apparently only one exception, the parties did not meet again until June when Siegel and his successor as Business Manager, Sam Krips, met Cornell and King for lunch. In response to a question by Krips en route to that lunch, Cornell explained that he was paying an attorney instead of paying more to the employees because his attorney was not costing much and because Cornell would "like to break the contract anyway." Despite the asserted low cost of his services, according to Cornell, King was skilled at achieving the objective sought. Cornell also explained at lunch that he wanted to "get out of the contract" because his was the only organized tie factory in Northern California and that he was not going to pay the Union's "ridiculous" wage rates and health and welfare costs.
 
 
 6
 As attorney King started to leave the luncheon meeting, Krips, seeking to arrange another conference, asked when they would meet again and King replied: "in the N.L.R.B. hearing." When they did meet again at that hearing in August 1975, the Company contended that it had refused to bargain based on a good faith doubt of the Union's majority status. Apparently the Company had first expressed such doubt in January 1975 in its answer to the Regional Director's unfair labor practice complaint.
 
 
 7
 At the Board hearing, the Company presented evidence showing that commencing in June of 1974 and continuing for the following four to six weeks, employees communicated their dissatisfaction with the Union to Julius Kozak, the Company's General Manager. Kozak testified that four different employees contacted him,[1] some on more than one occasion, and identified specific concern with the lack of a Union contract, ineffectual representation, disruptive meetings and a lack of benefits commensurate with the dues paid. Three of these employees informed Kozak that approximately 15 out of the 20 employees in the unit[2] also were dissatisfied with the Union but were afraid to express their views. At least once Kozak was asked how employees could "get out of the Union."
 
 
 8
 Kozak informed Cornell of these contacts and Cornell responded that he would have to take the matter up with someone conversant with the law. Cornell also was contacted by the same four employees and on another occasion spoke with three or four employees on the subject, but it is not clear whether the latter group was the same as that involved in the earlier conversations.
 
 
 9
 Nine employees subpoenaed by the General Counsel, including the group of four who were clearly identified as having spoken to Kozak and Cornell, were present at the Board hearing but were not called by either party. After a one-day hearing on August 26, 1975, the Administrative Law Judge handed down a decision finding that the Company had violated Sections 8(a)(1) and 8(a)(5) by withdrawing recognition and failing to bargain with the Union from November 25, 1974. Accordingly, the ALJ ordered the Company first to cease and desist from refusing to recognize the Union and from interfering with employee rights in any like or related manner. Affirmatively, the order required the Company to recognize and upon request bargain with the Union. On January 16, 1976 the Board affirmed the findings, rulings and conclusions of the ALJ and adopted his recommended order.
 
 
 10
 In rejecting the Company's claim of good faith doubt, the ALJ's opinion and the Board first reasoned that the "supposition and rumor" introduced by the Company in the absence of more manifest "authoritative verification or indicia of employee disaffiliation" was an insufficient basis for a reasonable doubt. They also reasoned that the Company's tactics "cast a pall of suspicion over Respondent's claimed legal justification" and therefore indicated that the Company's doubts were not held in good faith. We consider each of those reasons in order.
 
 
 11
 I. Whether the Company's Doubt was Reasonable
 
 A. Reliance on Employee Assertions
 
 12
 Both parties agree that although a union enjoys a rebuttable presumption of continued majority status, an employer lawfully may withdraw recognition from an incumbent union because of its asserted good faith doubt of the union's continuing majority status, if that doubt is reasonable and supported by objective considerations. See e. g., Terrell Machine Co. v. N. L. R. B., 427 F.2d 1088, 1090 (4th Cir. 1970), certiorari denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91; N. L. R. B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969). Their primary disagreement in applying that principle to this case is over the question whether statements by a minority of unit employees to the effect that a majority want to be free of the Union are sufficient to justify the requisite good faith doubt.
 
 
 13
 Although the Company cites numerous cases allegedly proving that the Board or courts have found such employee assertions sufficient in the past, our reading of those cases is consistent with the Board's position on this appeal that assuming such evidence may be one basis upon which a reasonable doubt could rest,[3] in the absence of special circumstances it has not been held to be and should not be sufficient by itself. In nearly all the cases cited by the Company, the assertion that the majority disliked the incumbent union was accompanied by evidence of some identifiable acts by the majority (or at least by a substantial number of the non-complaining employees) that lent support to the assertion of dissatisfaction: failure to sign cards of the incumbent Union,[4] increasing refusals to authorize dues checkoffs,[5] sufficient signing of decertification petitions,[6] significant resignations from the union,[7] direct communication of dissatisfaction to the employer by a majority of unit employees,[8] or widespread refusals by the employees to participate in union activities.[9]
 
 
 14
 This distinction based on a preference for objective, identifiable acts is not a technical one but rather is based on an interpretation of what is sufficient to form a reasonable doubt. First, the preference for some positive act by those whose anti-union sympathies are asserted reduces the likelihood that the minority of employees who make the assertions are mistaken or have misinterpreted statements by their colleagues. Cf. Retired Persons Pharmacy v. N. L. R. B., 519 F.2d 486, 490 (2d Cir. 1975); note 2 supra. Second, this distinction avoids allowing a few employees to undermine their union merely by making an assertion that is not easily verified by the employer. Our reference to this distinction is not meant to indicate that these objective acts necessarily are proof of loss of majority status or can constitute good faith doubt thereof,[10] nor is it meant to imply that establishing a good faith doubt requires actual proof that a majority of employees do not support the union; rather it means only that an employer cannot satisfy its burden of proof that the doubts were reasonable (see Retired Persons Pharmacy, supra at 489-490) by resting exclusively on such normally unreliable assertions. See N. L. R. B. v. Crimptex, Inc., 517 F.2d 501, 505 (1st Cir. 1975).[11]
 
 
 15
 As the Company notes, this preference for identifiable acts in addition to employee assertions may not be absolute, and in appropriate cases employee assertions might be sufficient if accompanied by special indicia of reliability. Compare Houston Shopping News, 233 N.L.R.B. No. 24. That theory does not apply to these facts, however, because unlike Houston Shopping News, where the employees who asserted the sentiments of their silent colleagues told the Board of their long association with the employer and apparently with their colleagues, and also apparently offered detailed descriptions of individual conversations with their colleagues about the union, no such special indicia of reliability were found by the Board here or argued by the Company in this court.
 
 
 16
 In fact, the employees who made the assertions here did not even testify before the Board although they were present at the hearing, a fact from which the Administrative Law Judge properly drew an adverse inference as to the reliability of their assertions. 220 N.L.R.B. 303 at 307. The Company's argument that the Board did not call the employees either and thus the adverse inference should be drawn against the Board reflects a misunderstanding of the reasons for drawing adverse inferences. See generally International Union (UAW) v. N. L. R. B., 148 U.S.App.D.C. 305, 459 F.2d 1329 (1972). Of course in theory it often can be argued that the adverse inference could be drawn against either party, but, reasoning from the purposes of the inference, it is generally recognized that the inference is drawn against the party with the burden of persuasion on an issue (see McCormick on Evidence § 272 (2d ed. 1972)) or against the party who is relying on the statements of the uncalled witness. See generally id. § 272 and n. 36. The inference would work against the Company under either of those theories. Moreover, in this case the General Counsel argued and the ALJ agreed that the Company never met its burden of proving a reasonable doubt; therefore the likely inference from the fact that the Board did not call the employees is that the Board properly decided that no proof on its part was necessary on the issue. Thus the inference was correctly drawn against the Company, and that inference, coupled with the lack of any positive showing of the reliability of the assertions, distinguishes this case from Houston Shopping News and indicates why the normally unreliable assertions by the employees are an insufficient basis for a reasonable doubt on these facts.
 
 
 17
 B. Reliance on the Unwillingness to Agree to an Election
 
 
 18
 Seeking to base its good faith doubt on another source, the Company contends that its doubt was based on the Union's unwillingness to agree to an election. It is true that such a refusal was given weight in N. L. R. B. v. Laystrom Manufacturing Co., 359 F.2d 799, 801 (7th Cir. 1966), where the Seventh Circuit reasoned that an inference that the union doubted its majority status could be drawn from such a refusal. However, reasoning from the fact that either one of two contradictory inferences can be drawn from such a refusal, we find the rationale of that case inapplicable here. On one hand, as in Laystrom, the union's refusal can be interpreted as meaning that the union doubts its majority status. On the other hand, it is at least equally plausible to assume that the union is unaware or does not believe that the employer has a good faith doubt and therefore feels no obligation to participate in the burdensome election procedure. See N. L. R. B. v. Trimfit of California, 211 F.2d 206 (9th Cir. 1954). Laystrom was a strong case for drawing the first inference. The union there in similar circumstances had agreed to an election (and won) in the past rather than insisting on avoiding the burdensome election procedure, and on the occasion in question the employer in advance of the election request had communicated to the union its good faith doubt. 359 F.2d at 800. Here, however, no past union practices fuel the inference that the union doubted its support and the employer's doubt was not communicated to the union until long after the election request. Significantly, in Laystrom the ALJ chose to draw the inference that the union doubted its majority status (or at least that the employer so thought) while here the ALJ did not. Because an inference of the state of mind of one of the parties is better drawn by the trier of fact and the Board (see N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305; 4 K. Davis, Administrative Law § 29.05) and in light of the distinction between Laystrom and our case, we give no weight to the Union's refusal to agree to an election on these facts.
 
 
 19
 II. Whether the Employer's Doubt Was Held in Good Faith
 
 
 20
 As an alternative ground, the Board noted that whatever doubts the Company had were not held in good faith.[12] Even assuming a sufficient basis for a reasonable doubt, it is well settled that an employer violates Section 8(a)(5) if its doubt is not held in good faith. See Teamsters Local Union 769 v. N. L. R. B., 174 U.S.App.D.C. 310, 313, 532 F.2d 1385, 1388, n. 8 (1976). Here the Board relied on the Company's use of "delaying devices" and its "clearly stated desire" to use its specialist attorney to free itself from the collective bargaining agreement in order to infer a lack of good faith. While consultation with an attorney even when combined with a desire to operate without a union is not a necessarily sufficient indication to doubt an employer's good faith (compare Schwarzenbach-Huber Co. v. N. L. R. B., 408 F.2d 236, 247 (2d Cir. 1969); Raymond Convalescent Hospital, 216 N.L.R.B. 494, 499 (1975)), the conversations in this case indicating a desire to use an attorney to break the contract, combined with the delaying tactics by the Company, form a sufficient basis from which to infer a lack of good faith. See generally N. L. R. B. v. Comfort, Inc., 365 F.2d 867, 876 (8th Cir. 1966). In addition, the Company's tardy notice of its doubt lends weight to the conclusion that the doubt asserted at the Board hearing and in this Court was not held in good faith at the relevant times. See N. L. R. B. v. Schill Steel Products, Inc., 480 F.2d 586, 591 (5th Cir. 1973); see generally Bally Case and Cooler, Inc. v. N. L. R. B., 416 F.2d 902, 905 (6th Cir. 1969), certiorari denied, 399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562. In short, the Board chose to draw the inference of a lack of good faith and the Company offers no reason to doubt that the evidence is sufficient to support that inference.
 
 
 21
 Finding either of the Board's alternative holdings sufficient, we therefore enforce its order.
 
 
 
 *
 Honorable Walter J. Cummings, United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Kozak was unsure whether he also had been contacted by a fifth employee. The Administrative Law Judge seemed to assume that only four employees were involved, but his conclusions would be unaffected even if five employees had complained to Kozak
 
 
 [2]
 The ALJ found that the size of the unit fluctuated from between 20 and 25 employees during 1974. Order p. 3. Both the testimony at the hearing and the ALJ's opinion leave unclear whether the 15 employees assertedly expressed a specific desire to get out of the Union or whether they merely expressed concern about the Union. Although the difference is potentially significant (see Retired Persons Pharmacy v. N. L. R. B., 519 F.2d 486, 490 (2d Cir. 1975)), neither the ALJ nor the Board in this Court stressed it and the assumption that the 15 employees assertedly wanted to leave the Union does not alter their reasoning or ours
 
 
 [3]
 See generally United Supermarkets, 214 N.L.R.B. 958, 959 n. 7 (1974), petition for review denied, 524 F.2d 239 (5th Cir. 1975)
 
 
 [4]
 See Automated Business Systems v. N. L. R. B., 497 F.2d 262 (6th Cir. 1974); Schwarzenbach-Huber Co. v. N. L. R. B., 408 F.2d 236 (2d Cir. 1969), certiorari denied, 396 U.S. 960, 90 S.Ct. 436, 24 L.Ed.2d 425; Hirsch, Etc. v. Pick-Mt. Laurel Corp., 436 F.Supp. 1342 (D.N.J.1977); Raymond Convalescent Hospital, 216 N.L.R.B. 494 (1975)
 
 
 [5]
 See National Cash Register v. N. L. R. B., 494 F.2d 189 (8th Cir. 1974); Star Manufacturing Co. v. N. L. R. B., 536 F.2d 1192 (7th Cir. 1976); Morse Electro Products Corp., 210 N.L.R.B. 1075 (1974)
 
 
 [6]
 See Automated Business Systems v. N. L. R. B., 497 F.2d 262 (6th Cir. 1974); National Cash Register v. N. L. R. B., 494 F.2d 189 (8th Cir. 1974); American Express Reservations, 209 N.L.R.B. 1105 (1974). See generally Guerdon Industries, 218 N.L.R.B. 658 (1975)
 
 
 [7]
 See National Cash Register Co. v. N.L.R.B., 494 F.2d 189 (8th Cir. 1974)
 
 
 [8]
 See Paramount Paper Products, 154 N.L.R.B. 1064 (1965); Faye Nursing Home, 215 N.L.R.B. 658 (1974); Raymond Convalescent Hospital, 216 N.L.R.B. 494 (1975). See generally Morse Electro Products Corp., 210 N.L.R.B. 1075 (1974)
 
 
 [9]
 See Intercollegiate Press, 194 N.L.R.B. 394 (1971); Kaydee Metal Products Corp., 195 N.L.R.B. 687 (1972). See generally Schwarzenbach-Huber Co. v. N. L. R. B., 408 F.2d 236 (2d Cir. 1969)
 
 
 [10]
 We recognize a split in the authority on whether such acts are entitled to any weight at all (see e. g., United Supermarkets, 214 N.L.R.B. 954 (1974)) but need not resolve that conflict to decide this case. If such acts are entitled to weight, the distinction offered in the text illustrates why employee assertions are entitled to considerably less weight. If identifiable acts are not entitled to weight, then the import of the distinction is that the cases cited by the Company rely heavily on factors deemed not persuasive but still do not reason that assertions by a minority, taken alone, are sufficient to justify a good faith doubt. Further, if such acts are entitled to no weight, then it would seem to follow that the less reliable assertions by employees similarly would be entitled to no weight
 
 
 [11]
 While Lloyd McKee Motors, 170 N.L.R.B. 1278 (1968), arguably referred to assertions by employees and no objectively verifiable acts, it is worth pointing out that in that case the Board at least observed and emphasized considerable employee turnover and laggard and inept union representation which impliedly supported an inference that the new employees did not support the union
 
 
 [12]
 Although this alternative ground could have been spelled out with greater clarity, it would render part of the ALJ's decision meaningless to deny the existence of this alternate ground. Thus after concluding and holding in the preceding paragraph that the Company did not have a reasonable basis for doubting the Union's majority status, the ALJ's opinion went on to catalogue the Company's questionable conduct before further concluding that "this conduct of Respondent fortifies the finding, which I make, that at no relevant time did Respondent entertain a good faith doubt as to the Union's majority status in the unit * * *." 220 N.L.R.B. at 307